## A. BRANCH v. THE WILMINGTON & WELDON RAILROAD COMPANY.

*Common Carriers--Railroads--Construction of Statutes- Computation of Time.*

1. A common carrrier is bound by the common law to convey goods committed to him for that purpose within a reasonable time, and on failure, is liable in damages.

2. A common carrier, especially one having a monopoly, who invites public custom is bound to provide sufficient power and vehicles to carry all goods which his invitation naturally brings to him.

3. Corporations like all other persons are subject to the police power of the State; *Therefore,* the Act of Assembly (Laws 1874-'75, ch. 240, § 2) which prescribes a forfeiture of $25 per day for delay of local shipments beyond five days after the receipt of goods by a railroad company, is constitutional.

4. In computing the time in such case the words "five days" include Sunday and must be taken to mean five *running* days.

(Legislative exercise of the police power of the State reviewed by Mr. Justice RODMAN.)

CIVIL ACTION tried on appeal from a Justice of the Peace at Spring Term, 1877, of WILSON Superior Court, before *Moore, J.*

On the 10th of October, 1876, the plaintiff delivered to defendant company at its depot in the town of Black Creek, Wilson County, thirty-one bales of cotton to be shipped to Norfolk, Virginia, and at the same time the defendant gave to the plaintiff a bill of lading for the cotton, signed by the agent of the company. The plaintiff did not tender payment of freight, nor was it demanded, nor was it the custom for shippers to prepay freight, nor was there any agreement between the parties that the cotton was not to be shipped within five days from date of its delivery to the company.

The cotton was shipped on the morning of the 19th of October, 1876.

The defendant owned a large number of cars and engines—more than sufficient for the ordinary freight business—but during the season of 1876, there was a great press of business for about six weeks in transporting through cotton from Wilmington to the northern markets, which amounted to 4200 bales during the said month. The cars were used for the shipment of this freight, a large quantity of which was detained in Wilmington, owing to the inability of the company to afford more speedy transportation. There was considerable competition between different roads for this class of business. The gauge of the road south of Wilmington from which the cotton was received, is different from that of defendant's road, which rendered it necessary to break bulk at Wilmington. The gauge of the roads north of Weldon is the same as that of defendant's road, and the defendant could have obtained from the north, a sufficient number of cars for the transportation of all its freight, both local and through.

Upon the foregoing facts found by His Honor, a jury trial having been waived, there was judgment that the plaintiff recover of the defendant, the sum of one hundred dollars and costs, and the defendant appealed.

*Mr. F. A. Woodard*, for plaintiff, cited *Ulman & Scott* v. *State of Illinois*, and *Chicago & Burlington R. R. Co.* v. *Quincey*, U. S. Supreme Court Reports ; Cooley Const. Lim. pp. 576, 578, 580, 581 ; *State* v. *R. & D. R. R. Co.*, 72 N. C. 634; *Hardy* v. *C. C. Railway Co.*, 76 N. C. 55 ; 2 Dillon Corp. § 455.

*Mr. W. N. H. Smith*, for defendant, cited *State* v. *R. & D. R. R. Co.*, 73 N. C. 527 ; *State* v. *Simpson, Ibid*, 269 ; Cooley Const. Lim. 576, *et seq.*

RODMAN, J. 1. The recent decisions in the Supreme Court of the United States in what have been called the " Granger Cases" (not yet officially reported but which will probably be found in 94 U. S. Reports) enable us to put our decision in this case upon a principle, not only satisfactory as being reasonable and just, but which, as being established by a judgment of the Court of final resort having jurisdiction of the question, must be taken as beyond controversy.

The principle is this ; " When private property is devoted to a public use, it is subject to public regulations." And this is more especially true, when the owner has either a legal or a virtual monopoly of the business in which the property is used.

This principle has immemorially in England, and in this country from its first settlement, been assumed in Acts of the several Legislatures, prescribing the charges of innkeepers, ferrymen, and other common carriers, public wharfingers, warehousemen, &c.

The Act of 1798, (Rev. Code, ch. 79 § 3,) as to ordinaries and innkeepers authorized the County Courts to rate their prices for liquor, diet, lodging, provender, &c. The Act of 1779, (Rev. Code, ch. 101, § 27) regulates in like manner the tolls at public ferries, and the Act of 1777, (Rev. Code, ch. 71, § 61) the tolls at public mills.

The constitutionality of these Acts has never been questioned, but they have been always regarded as wise and politic exercises of the police power of the State.

There can be no distinction in principle between the power to enact those Acts and the one in question in this case. Of course] it cannot affect this case, that the defendant is a corporation. Corporations, like all other persons, are subject to the police power of the State. There is no exemption in this respect in the charter of the company. It was granted great privileges in consideration of the performance of certain duties to the public. It enjoys a virtual monopo-

ly of the carriage of freights within a certain distance on each side of its line across nearly the entire breadth of the State. It enjoys, through the proverbial "wisdom of the Legislature," the privilege of having its property exempt from the general burden of taxation. There could not be a clearer case of private property devoted for a valuable consideration to a public use, and consequently subject to public regulation.

That the regulation in question is within the scope of the police power of the State seems clear to us. A common carrier is bound by the common law to convey goods committed to him for that purpose within a reasonable time, and on failure, is liable in damages.

The Legislature considered the common law liability as insufficient to compel the performance of the public duty. It must have thought that the interest of local shippers, for whose interest principally the road was built, and against whom the company had a complete monopoly, were being sacrificed by wanton delays of carriage in order that the company might obtain the carriage from points where there were competing lines by land or water;—as from Wilmington or Augusta. It declared, therefore, that the maximum of delay should be five days after a receipt for carriage, and imposed a penalty for every day's delay beyond. The Act does not supersede or alter the duty or liability of the company at common law. The penalty in the case provided for is super-added. The Act merely enforces an admitted duty.

2. Having seen that the company was *prima facie* liable, we proceed to consider its excuse. It is unnecessary to consider whether any excuse short of "an act of God or of the King's enemies," would suffice. 1 Pars. Shipping, 314. We concur with the Judge that the excuse offered was insufficient.

A common carrier (especially one having a monopoly of the carriage) who invites the public custom is bound to pro-

vide sufficient power and vehicles to carry all the goods which his invitation naturally brings to him. The quantity of local freight he can foresee with approximate accuracy, and his first duty is to provide for that. If in consequence of special inducements held out by him, the amount of freight from distant and foreign points, or through freights, which may not be a matter of certain calculation, is unexpectedly large, he is not at liberty to delay and injure the local shippers whose wants he foreknew and was bound to provide for; but he must rather reject the distant freight at the risk of breaking his promise and incurring damages to those shippers, because the quantity of their freight he could not foresee, and was therefore bound absolutely to provide for only by his own voluntary promise, and not by a duty imposed by the common law.

That the defendant did not have a sufficiency of cars in which to carry plaintiff's cotton cannot be deemed a legal excuse, when it is seen that the deficiency was in consequence of its own acts in inducing large shipments from points beyond its southern terminus.

The effect of these inducements it was bound to foresee and provide for. If a Railroad should advertise that on a certain day it would take all persons, say from Raleigh to Charlotte, on its regular passenger train at half price, and its cars should in consequence be filled, it would not excuse it in excluding any local passenger. Its duty was to provide accommodation for the extraordinary passengers *in addition* to the necessary accommodation of its usual local travel, and not *to the exclusion* of such travellers.

We can cite no case in which the question we have been considering has been made; but our conclusion seems just and reasonable.

A delay of local shipments, caused by a lack of cars, which lack is caused by a pressure of through freight, caused by inducements held out by Railroad Companies, was the very

evil which the Act of 1874–'75, undertook to remedy; and if such an excuse is admitted, the Act is a dead letter, and we shall continue to see farmers whose taxes built the roads, carrying their crops to market in ox carts along the sides of the Railroads.

3. It appears however that the defendant company could have gotten additional cars from the North, and it does not appear that they could not have been gotten by ordinary diligence.

A Railroad Company is bound at common law, independently of any statute, to use at least ordinary diligence in procuring a sufficiency of cars to carry all the freight tendered it, and certainly all that is accepted by it for shipment. This principle is so reasonable that it needs no support from authority, but it may be illustrated by two cases. In *Williams* v. *Vanderbuilt*, 28, N. Y. 217, the plaintiff purchased of the defendant, tickets entitling him to a passage from New York to Greytown, thence to San Juan, and thence by the steamer "North America" to San Francisco. That steamer, however, had been wrecked and lost before the tickets were purchased, but the loss was unknown to both parties. The plaintiff was carried to San Juan, but in consequence of the neglect of the defendant to procure a steamer from thence to San Francisco, was detained for sometime on the Isthmus, and the Court held that it was the duty of the defendant to procure another steamer, if by ordinary diligence he could have done so; and that plaintiff was entitled to recover for the damages caused by his failure to do so. In *Collier* v. *Swinney*, 16 Mo. 484, the defendant agreed to carry tobacco for plaintiff from Glascow to St. Louis on defendant's steamer, "Wapello." This boat was detained for some time with the cargo on board, by low water, while boats of less draught were running. It was held that defendant should have transmitted the tobacco by the smaller boats.

BRANCH *v.* W. & W. R. R. Co.

These cases, it is true, were actions on contracts, and it may be that sometimes an excuse will relieve from a mere statutory duty, which will not from a duty assumed by contract. But here the statute did not create the duty. That existed at common law, and by the contract implied upon the receipt of the goods. The statute only added a penalty for the neglect to perform the duty after a certain time.

4. The only remaining question is, for how many days did the company incur the penalty? The cotton was received and a bill of lading given on Tuesday the 10th of October. It was shipped on the 19th of October. The Act (1874-'75, ch. 240, § 2) says; "It shall be unlawful for any Railroad Company, &c., to allow any freight they may receive for shipment to remain unshipped *for more than five days,* unless otherwise agreed * * * and any company violating this section shall forfeit and pay $25 for each day said freight remains unshipped, to any person suing for the same."

The rules for the computation of time ordinarily cited are not applicable here. They may be found in Com. Dig. *Temp;* 13 U. S. Dig. § 1 *Time.* In all cases where it can be gathered from the words, the intent must prevail, and one day or both days will be included or excluded, as the intent may require. If the language of a penal statute is ambiguous, that construction will be given it which is most to the advantage of the person upon whom the penalty is imposed. *Judd* v. *Fulton,* 10 Barb. (N. Y.) 117; *State* v. *Schnierle,* 5 Rich, (S. C.) 299 ; *O'Connor* v. *Towns,* 1 Tex. 107.

In this case the longest time of delay before the penalty attaches, is evidently advantageous to the defendant; and we think also that the intent of the Act is clear, to allow five *full* days of demurrage. Five full days expired with Sunday, the 15th of October. If Sunday is to be counted as one of the days, the first penalty was incurred on Monday, the 16th, the second on the 17th, the third on the 18th. On Thursday, the 19th, the cotton was shipped. The day of

shipping should not be counted, because no penalty is incurred by any delay of a fraction of a day. The question remaining then, is : Shall Sunday be counted as one of the five days of permitted demurrage?—or shall it be ignored as a day, and the following Monday be allowed as an additional day of demurrage ? in which case the penalty will have been incurred for two days only, instead of for three days, if. Sunday be counted. The only analogous case that occurs to us, on which there is any authority, is where a certain number of days is stipulated for, in a charter party for lading or unlading, which is called demurrage. There it has been held that the days are running days, and not working days, unless otherwise stated, and that Sundays and Holy days are to be counted. *Brown* v. *Johnston*, 10 M. & W. 331 ; *Brooks* v. *Minturn*, 1 Cal. 481. In support of a different view, *Cochran* v. *Retberg*, 3. Esp. 121, was cited on the argument of these cases, but there a custom of the port was proved, that Sundays should not be counted. There is no such proof in this case. We think that by the words "five days," the Act meant *running* days, and that Sunday was one of them.

Judgment below reversed, and the plaintiff will have judgment in this Court for seventy-five dollars.

PER CURIAM.                    Judgment accordingly.