WHITEHEAD & STOKES v. WILMINGTON & WELDON RAILROAD COMPANY.

*Common Carriers—Railways, liability of—Bill of Lading.*

1. The rigid rule of the common law in reference to the liability of common carriers, should not be applied to a case involving the violation of a penal statute.

2. In an action by the plaintiff against a railway company for the penalty for delay in shipment of cotton, under the act of 1874-'75, ch. 240, § 2, caused by increase of freight ; by the refusal of a connecting road of the same through line to transfer defendant's flat-cars over its road loaded with cotton ; by the detention of defendant's box cars at terminus of said connecting road ; and by its inability to procure other cars in time to ship plaintiff's cotton ; and not by its competition with other lines for through freight—the defendant not being responsible for the causes of delay ; *It was held :*

   (1) To relieve from the penalty, the burden is upon the defendant to show that the shipment was " otherwise agreed " upon between the parties.

   (2) And the through bill of lading (advantageous to both) received by the plaintiff, without objection, that the cotton was to be shipped " at company's convenience," is evidence of plaintiff's assent to the restriction of defendant's common law liability, equivalent to an express agreement, and affects plaintiff with legal notice of its terms.

   (3) Ordinarily, a stipulation to ship " at company's convenience " is too indefinite, and therefore unreasonable ; but under the circumstan-

stances in this case, the defendant is entitled to set up the agreement as a defence to the action for the penalty.

(4) Common carriers exercise a *quasi* public office, and are subject to legislative control.

SMITH, C. J. *Concurring.*
RUFFIN, J. *Dissenting.*

(*Branch* v. *R. R. Co.*, 77 N. C., 347; *Keeter* v. *R. R. Co.*, 86 N. C., 346; *Capehart* v. *R. R. Co.*, 81 N. C., 438, cited and approved.)

CIVIL ACTION begun before a justice of the peace and tried on appeal at Spring Term, 1882, of EDGECOMBE Superior Court, before *Bennett, J.*

This action was brought to recover the penalty under the act of 1874–'75, ch. 240, §2, for failing to ship the cotton of the plaintiffs for more than five days after its delivery to defendant company.

The act is as follows: It shall be unlawful for any railroad company operating in this state to allow any freight it may receive for shipment, to remain unshipped for more than five days, unless otherwise agreed between the company and the shipper; and any such company violating this section shall forfeit and pay the sum of twenty-five dollars for each day said freight remains unshipped, to any person suing for the same.

A jury trial was waived, and the facts were found by the court as follows:

1. Plaintiffs delivered to defendant's agent at Battleboro station on the 2nd of November, 1881, four bales of cotton consigned to Tredwell & Co., at Norfolk, Virginia, and the defendant allowed the same to remain unshipped for six days in excess of five full days of demurrage.

2. A bill of lading, of which the following is a copy, was executed on the day the cotton was delivered:

[No. 264]        WILMINGTON & WELDON RAILRAOD,
                 BATTLEBORO STATION, Nov. 2d, 1881.

Received of Whitehead & Stokes for transportation, at company's convenience, with liberty to compress while in transit, as per marks and directions as herein given, subject to the conditions stated upon the back of this receipt, and to which, by the acceptance thereof, the shipper assents, the following described bales of cotton. (The marks indicated the consignors, number and weight of the bales of cotton, and name and place of consignee, and the receipt was signed by the company's agent.)

3. The said bill of lading was on the same, or the next day, put into the hands of W. D. Stokes, one of the firm of Whitehead & Stokes—both members of the firm being educated men, able to read and write.

4. The cotton was not shipped until the 14th of November, 1881.

5. The said firm did not know the contents of the bill of lading, and never read it, until after suit brought, nor did the said agent of the defendant.

6. The road of defendant company is a connecting link in the Atlantic Coast Line, and the defendant's rolling stock was sufficient to transfer all the freight which came to it, either as through or local freight, with prompt dispatch.

7. Early in September, 1881, the Seaboard & Roanoke railroad company, one of the links of the Atlantic Coast Line, notified the defendant that it would not transfer over its road flat-cars, belonging to defendant company, loaded with bales of cotton.

8. During the months of October, November and December, 1881, there was an increase of 4836 bales of cotton carried by defendant over its road, as compared with the same months of the year before.

9. Of such increase 734 bales were at Battleboro and

Whitaker's stations, and 1149 bales were at points south of those places.

10. The defendant owns 120 flat-cars, each of capacity to carry forty bales of cotton, and they could not have been replaced with box-cars between September and November, 1881.

11. Defendant shipped no cotton beyond its immediate line on flat-cars, after the notice from the Seaboard road, but did ship some flat-loads of cotton received by it from the North Carolina road.

12. Shipments of cotton over defendant's road were greater in November and December, each, than in October, 1881.

13. The cotton for which the bill of lading was given was through freight, the plaintiffs applying for and receiving the same, to a point without the state and beyond the terminus of defendant's road, and a through bill of lading was advantageous to plaintiffs by giving them lower rates, and also to defendant by obviating the necessity of breaking bulk at Weldon (the northern terminus of defendant's road.) Through bills of lading have been in use by defendant for ten years.

14. There was an increase in the tonnage carried over defendant's road during October, November and December, 1881, of 11,054,437 pounds.

15. The cotton of plaintiffs received by defendant was carried through to Portsmouth, Virginia, in cars belonging to defendant.

16. The refusal of the Seaboard road to carry flat-cars of defendant loaded with cotton, over its road, and the increased tonnage of defendant's freight and detention of defendant's cars at Portsmouth, were causes of delay in carrying through freight.

17. Plaintiffs knew that the cotton was not shipped within five days after delivery, and yet made no objection before

the 14th of November, 1881, to the bill of lading; but did not know at the time, that is, during the delay in shipment, the contents of the bill of lading.

18. Defendant has used flat-cars for ten years in shipping cotton.

19. The delay in the shipment was not caused by competition for through freight.

20. Defendant employed the services of a car-tracer, and used the telegraph wire almost daily to get its cars returned promptly from Portsmouth; and if its cars had been used to carry freight to Portsmouth, all freight could have been moved without delay.

21. The form of said bill of lading was first used by defendant after the ratification of the said act of 1874-'75.

22. The defendant, in fact, ran over its road two kinds of freight trains, a "through" and "local," and the same number of each, daily; the through freight train took no freight along the line of road between Wilmington and Weldon, except at Goldsboro, (where now and then it took on cars). These freight trains were made up of cars belonging to the Seaboard road, as well as those of the defendant.

Upon these facts the judge held that the defendant was liable to the penalty of twenty-five dollars per day, for six days. Judgment was accordingly rendered in favor of the plaintiffs, and the defendant appealed.

The defendant excepted to the conclusions of law as announced by His Honor, because,

1. Under the facts found the defendant is exonerated from the penalty, and the judgment is erroneous.

2. By applying for a bill of lading to have freight shipped beyond the state and defendant's terminus, and receiving the same, the plaintiffs thereby waived the penalty.

3. The plaintiffs, having received the bill of lading and having made no objection thereto, are bound by its terms.

4. The act cannot be construed to embrace freight agreed

to be shipped as through freight by defendant, and beyond its line and out of the state.

5. The act is unconstitutional, in that; first, it is in contravention of defendant's charter, and secondly, it affects inter-state commerce.

*Messrs. Bunn & Battle*, for plaintiffs.
*Mr. John L. Bridgers, Jr.*, for defendant.

ASHE, J.   We cannot concur in the conclusion of law to which the court came, upon the facts found.

The action is brought upon a penal statute, which is always to be construed strictly in favor of those who are charged with violating its provisions.  The rigid rules therefore, of the common law with reference to the liability of common carriers, should not be applied to a case involving the violation of a penal statute.

In *Branch* v. *R. R. Co.*, 77 N. C., 347, which like this was an action to recover the penalty given by the act of 1874–'75, it was very clearly intimated, that the excuse of inability to provide cars sufficient to transport the freight delivered to the company, in consequence of the accumulation of freight, would have availed the defendant as a defence to the action, if it had not caused the accumulation by a competition with other roads for through freight.

In *Keeter* v. *R. R. Co.*, 86 N. C., 346, which has been referred to as authority for the position that no excuse is admissible to exempt a railroad company from the penalty, when it violated the letter of the statute, it may be well to observe that this court did not enter fully into the discussion of that question ; for it was not necessary to do so, as the case turned upon the point, that the delay with which the defendant was charged, had not continued beyond five full running days.  *Branch's case* was cited as authority for that position, and the case went off upon that

point. The other point, as to the excuse, did not engage the special attention of the court, as its consideration was not necessary to the decision of the case; and the court could not have intended to hold that there could be no excuse, when it was citing *Branch's case* with approval, in which it is conceded that excuses may be admitted.

The question then is, has the defendant incurred the penalty, or are the excuses given by it sufficient to exonerate it from liability?

The statement of the case discloses the following facts:

That there was a considerable accumulation of freight along the line of defendant's road during the months of October and November, caused by an increase in the crop, but not by any competition of the defendant for through freight.

· That it had been shipping cotton on flat-cars over the Seaboard road for ten years previous to October, 1881, and had 120 cars, each with capacity to carry forty bales of cotton, which were sufficient to transport all the freight that came to it, either as through or local freight, with promptness and dispatch. But sometime in September, 1881, the Seaboard road notified the defendant that it would not transfer over its road flat-cars, belonging to the defendant, loaded with bales of cotton; and after that, box-cars in place of these excluded cars, could not have been procured before the 2d day of November, when the cotton was delivered by the plaintiffs for shipment. After the exclusion of its flat-cars from the Seaboard road, the defendant was put under the necessity of running through to Portsmouth its box-cars to carry freight through, and but for that, could have transported all the freight delivered.

· That the delay in shipping the plaintiffs' cotton was caused by the increase in freight, the refusal of the Seaboard road to admit the defendant's flat-cars on it, loaded with

cotton, the detention of its box-cars at Portsmouth, and its inability to procure other cars in time for this shipment.

And for these causes of delay, it does not appear that the defendant was in any way responsible. It could not have prevented the increase in freight, nor the unexpected action of the Seaboard road in reference to its flat-cars, and it seems, it did all in its power to prevent the detention of its cars at Portsmouth. It employed the services of a "car-tracer," and used the wires almost daily to get its cars returned from Portsmouth.

It is true, if the defendant's box-cars had not been used to carry the freight through to Portsmouth, the plaintiffs' cotton and all other freight could have been moved without delay. But a through bill of lading is advantageous to both parties—to the defendant, by saving it the trouble and expense of breaking bulk at Weldon, and to the plaintiffs, by giving them lower rates of transportation, and this is probably the reason they applied for and received a bill of lading for through freight to Norfolk ; and after doing so, it will not do for them to say, if their cotton had been shipped only to Weldon and the defendant's box cars had not been used to carry cotton to Portsmouth, the delay would not have occurred.

The delay in making the shipment then, it seems, has not been caused by any act of negligence or default on the part of the defendant, but resulted from the concurrence of circumstances entirely beyond its control. And if a common carrier can be exonerated in any case from the penalty given by the statute, we think this is one of the cases where it should be excused. When the facts as found in this case show that, by force of circumstances for which it was in no way responsible, it was disabled from performing the duty imposed by the statute, it would be unjust to punish it for failing to comply with its requirements.

Every common carrier who receives goods for transporta-

tion is bound to ship them within a reasonable time, and when the common law imposed that duty, and the legislature defines what is reasonable time, and subjects to a penalty the failure to comply with its requirements, *unless otherwise agreed* between the railroad and the shipper, the burden is on the railroad company to show the agreement relied upon in its exoneration. The defendant here says there was such an agreement between the railroad and the plaintiffs, and points to the restriction in the bill of lading given the plaintiffs, which is, *that the cotton of plaintiffs is received for transportation at company's convenience.*

That a railroad may restrict its common law liability, except for its own or its servants' negligence, is now generally admitted to be law. Redf. on Railways, 99, and the authorities there referred to; *Capehart* v. *R. R. Co.*, 81 N. C., 438, and cases there cited.

But to avail the defendant, the restriction must be brought to the knowledge of the shipper; and it is held that a restriction in a bill of lading given to the shipper at the time of the delivery of the goods, and received by him without remonstrance or objection, is evidence of an assent to the restriction, and is equivalent to an express agreement. *Burgess* v. *Townsend*, 37 Ala., 247; *Belger* v. *Ginsmore*, 54 N. Y., 166.

The plaintiffs however say they did not read the terms of the shipment until a few days before the action was commenced, but they could read, and the condition is in full print upon the face of the bill of lading, and it was their own fault they did not read it. We think it affected them with legal notice. *McMillan* v. *R. R. Co.*, 16 Mich., 79.

There was here then an agreement between the plaintiffs and the defendant company to ship the plaintiffs' cotton *at its convenience*, and the question resolves itself into the inquiry whether the restriction or agreement was reasonable.

Except under circumstances like those disclosed in the

case, we should unhesitatingly hold that it was not a reasonable restriction upon defendant's liability. When it is its duty to ship in a reasonable time, and the law limits the time to five days, a stipulation to ship *at convenience* is too indefinite, and therefore unreasonable. But under the extraordinary combination of adverse circumstances developed in this case, over which the defendant had no control, nor power, nor means to prevent or foresee, we must conclude that the condition was not so unreasonable as to prevent the defendant from setting it up as a defense, in an action for the penalty prescribed by the statute.

The view we have taken thus far, disposes of the first four points of law raised by the defendant in the court below.

But the defendant also insisted that the act of 1874–'75 is in violation of the constitution, and in contravention of its charter. Both of these questions are definitely settled adversely to the defendant's position, by the decision in *Branch's case, supra.*

The defendant further contended that said act affected inter-state commerce, and was therefore void. But this question has been as satisfactorily settled as those just mentioned. The supreme court of the United States has recently decided that railroads as common carriers exercise a sort of public office, and have duties to perform in which the public is interested; and that being so, they are subject to such regulations as may be established by the proper authorities for the common good. And where a railroad is situated within the limits of a single state, its business is carried on there; and its regulation being a matter of domestic concern, if it is employed in state as well as inter-state commerce, unless congress acts, the state must be permitted to adopt such rules and regulations as may be necessary for the promotion of the general welfare of the people within its territory, though in doing so, it may indirectly

operate upon commerce outside its immediate jurisdiction. *Munn* v. *Illinois*, 4 Otto (U. S. Rep.) 113; *Chicago, &c.,* v. *Iowa, Ib.,* 155.!

In view of the special circumstances of this case, our conclusion is that the defendant is exonerated from liability to the penalty, and that there is error in the judgment of the superior court, which is therefore reversed, and judgment must be entered here for the defendant.

SMITH, C. J., *Concurring.* I concur in the conclusion reached by my brother ASHE, that upon the facts found by His Honor the defendant company has not incurred the penalty imposed by the act of 1874–'75, for delay in transporting the plaintiffs' goods. It is given to any person suing for the same, whenever any railroad company operating in the state shall *allow* any freight it may receive for shipment to remain unshipped for more than five days, unless otherwise agreed between the railroad company and the shipper—contemplating a voluntary and unreasonable delay in forwarding.

When the construction of the act came before the court in *Branch* v. *R. R. Co.*, 77 N. C., 347, in answer to the argument that it was in violation of chartered rights, RODMAN, J., delivering the opinion, declared that "the act does not supersede or alter the duty or liability of the company at common law; the penalty in the case provided for is superadded; the act merely enforces an omitted duty."

It therefore becomes a question, whether, if the owner sued to recover damages for the delay, the matters in explanation and excuse would be a defence to the action, and exonerate the company from the imputed negligence on which its liability depends. The delay is accounted for by the defendant on the ground that early in September the Seaboard and Roanoke railroad company, one of the connecting lines over which the cotton was to pass in reaching

the place of destination, refused to carry cotton longer over its road in flat or open cars, rendering useless to the defendant for that purpose 120 cars of that class, before in use as part of its rolling stock, and its inability to procure box or close cars to take their place after such notice and before November, on the second day of which the cotton was placed in the defendant's warehouse; and further, because of the large accumulation of freight in excess of that received the previous year, during the same interval, heavily taxing the resources of the company and its means of transportation.

It is found by His Honor in general terms that these, and the detention of the defendant's cars at Portsmouth, the northern terminus of the through route, notwithstanding the diligent efforts of the defendant by the constant use of the wires to procure their prompt return, were causes of delay in carrying through freight.

Under these circumstances can it be said that the defendant did "*allow*," in the sense of the statute, that unreasonable delay in forwarding the goods, which subjects to the condemnation and severe inflictions, irrespective of actual damage, imposed therefor? The enforcement of such a construction would be harsh to those public carriers that are made to suffer by it, and would not subserve any good purpose to those for whose benefit it was made. There is no discrimination made between through and local freight, since trains of each kind ran each way daily over the road, furnishing equal facilities for the moving of both.

In construing a statute of New York, which requires its railroad corporations to have fixed times for running their passenger and freight trains, and that they shall "furnish sufficient accommodation for the transportation of all such passengers and property as shall within a reaonable time previous thereto be offered for transportation at the place of starting and the junctions of other railroads, and at usual stopping places established for receiving and discharging

way passengers and freight," &c., in an action brought to recover damages for delay, the court of appeals of that state use this language: "What is a reasonable period must depend upon the actual circumstances existing at the time the property is offered for transportation."

Referring to the finding of the referree, DENIO, J., states them summarily thus: The defendants were without fault in respect to the state of their roads; they had provided sufficient cars and engines, and sent forward as many freight trains as safety would permit; but owing to an unusual demand for transportation at that time, the plaintiff's property could not be sent forward faster than it was sent. If under such circumstances a railroad company would be liable on account of a tardy delivery, the business would be quite too hazardous to be followed by business men. * * * If, when a particular parcel is offered, the next train is filled up, the goods must wait for the succeeding train; or if, on account of an unusual accumulation, the means of transportation for several successive trains, or for several days, are anticipated, the property must remain until its time shall arrive, *subject to the qualification that the company must not be in fault in providing sufficient accommodation for the general traffic of the road under ordinary circumstances.* Webert v. N. Y. & E. R. Co., 2 Kernan, 245.

The principle extracted from this case is thus declared by an eminent author: "If the carrier, being a railway company, make no special contract to deliver in any particular time, and a delay happen in the transportation in consequence of an unusual press of business, the company having a reasonable equipment for all ordinary purposes, and the goods being carried with as much expedition as is practicable under the circumstances, they are not liable for damages." 2 Redf. on Railways, § 173 (2).

This seems to be a just view of the carrier's liability at common law; and the statute, as this court declare in the

case cited, does not enlarge or extend the obligation, but merely provides an additional method of enforcing it.

In ascertaining the legislative will, as conveyed in enactments, it is the duty of the court to put a fair and reasonable interpretation upon the language used to express it, so as to subserve the ends to be attained without injustice to those of its citizens upon whom its provisions operate. And in my opinion the delay was not *allowed*, that is, the transportation not unreasonably and negligently deferred, so as to expose the defendant to the punitive inflictions of the statute.

I therefore express my concurrence in the opinion delivered as that of the court.

RUFFIN, J., *Dissenting.* I am always distrustful of myself when differing in opinion with my associates, and nothing induces me to do so now, but a conviction, so strong, that I cannot get rid of it, and yet one which I most respectfully give utterance to, that the conclusion reached by them in this case is not a correct one in principle nor supported by authority.

In the first place, I cannot agree that the statute under which the plaintiffs proceed, and to which reference is had in the opinion of the court, should be strictly construed because of its nature. It imposes no new duty upon the defendant, nor adds to or alters the obligations which it has voluntarily assumed. Like every other common carrier, the defendant owes the duty, by virtue of the common law alone, of providing adequate facilities for the transportation of goods received by it for that purpose, and of transporting them within a reasonable time. And the statute, so far from being in derogation of common right, is intended simply to enforce an admitted duty, and to declare a reasonable time within which it must be performed. Its purpose is to promote the public convenience, and therefore its in-

terpretation should be, neither liberal nor rigid, but *just,* and such as will give effect to the salutary intention of the legislature; and nothing short of that diligence, which would acquit the defendant of its common law duty and liability, should be allowed to exonerate it from the penalty prescribed by the statute.

In the next place, the fact, as established by His Honor, that so soon as the statute was enacted the defendant adopted for use the form of the bill of lading, given to the plaintiffs, promising *to transport at the convenience of the company,* goes very far towards proving that its conduct in the matter has not, at all times, been controlled by the pressure of necessity, so much as by a purpose to evade the law, and at the same time avoid the consequences of so doing. It is difficult under such circumstances to listen with entire confidence to the tale of an overruling necessity, which the defendant puts up in the case.

The statute, however, provides that the parties may by special agreement regulate the time of shipment, and the defendant insists that it has done so in this case, and that by such agreement it was allowed *to transport at the convenience of the company.* But, as I understand the opinion of my brethren, they hold that such a stipulation as this is too unreasonable and uncertain to have the effect of taking the case from within the statute, (and in this conclusion I most heartily concur) and the exoneration of the defendant is made to depend solely upon the circumstances of uncontrollable necessity, in which it unexpectedly found itself placed.

What those circumstances are, thus relied upon by the defendant, is clearly established by the findings of the judge in the court below, and (discarding all immaterial matters) may be stated to be:

1. The increase in the defendant's freight and tonnage

in the fall of 1881, resulting from the increased crop of cotton made that year.

2. The detention at Portsmouth of such of defendant's cars as had been sent forward to that place.

3. The refusal of the Seaboard and Roanoke railroad company to transfer its flat-cars if loaded with cotton.

And the only remaining question is as to their sufficiency for the purposes for which they are invoked.

As to the first—The increase in freight and tonnage : It has been solemnly adjudged by this court in *Branch* v. *R. R. Co.*, 77 N. C., 347, to be insufficient to excuse the negligence of a carrier, such as the defendant is, for that, it is the duty of every carrier who invites custom, and especially one having a monopoly of carriage, *to foresee* with approximate accuracy any increase of *local freight* that may be likely to occur, and to provide for it, in anticipation, the requisite power and vehicles of transportation.

Second—The detention of the defendant's cars at Norfolk, surely, is entitled to no more weight than the other excuse. It could have proceeded only from one of two causes—either the defendant or its co operating roads must have failed to provide sufficient car-force for the work to be done upon the whole line, or else some one of the other roads has been positively negligent in returning the defendant's cars when not needed. And if from the latter cause, then, the defendant has its redress upon that negligent company for any damages it may have to pay the plaintiffs.

Third—The refusal of the connecting road to transfer the defendant's flat-cars seems to fall directly within the principle decided in *Condict* v. *R. R. Co.*, 54 N. Y., 500. There, the defendant being a railroad carrier had an arrangement with other roads as to freight and the division thereof, which however proving unsatisfactory, those roads, about two weeks before the plaintiff's goods were delivered for transportation, refused to take any more goods from the defend-

ant witbout an increase in charges, which defendant refused
to pay, and hence the plaintiff's goods were delayed; *it was
held* that the defendant should not, with a knowledge of all
the facts, have contracted for the delivery of the goods within
a reasonable time, at least, without giving the owner notice
of the difficulties in the way. And just so it is with this
defendant.

With a full knowledge of its lack of proper facilities for
shipping cotton, and having had timely notice given it of
the purpose of the connecting road not to receive it when
loaded upon flat-cars, it contracted, without a word of warn-
ing to the plaintiffs, for the delivery of their cotton at Nor-
folk with reasonable dispatch; and. it is now too late for it
to claim exemption from a delay caused by the refusal of the
other road.

Again, upon what was that refusal to transfer flat-cars
based? Manifestly upon the well known insecurity which
attends that mode of moving cotton. And should the de-
fendant, who owes the duty of providing safe as well as
prompt transportation, be permitted to excuse its negligence
upon a plea that for ten years it had resorted to that reck-
less mode of shipment? This, to my mind, is to allow the
defendant to take advantage of its own wrong, and to estab-
lish for itself an immunity by its own persistent violation
of duty.

Another fact found by the judge, and I think conclusive
upon the point of defendant's liability, is, that during the
whole of the eleven days in which the plaintiffs' cotton was
delayed, the defendant had, in addition to its " local freight
train," a regular. " through freight train," composed of its
own cars and those belonging to the Seaboard road, which
passed daily by its depot where the cotton was stored; but,
that upon this latter train, it permitted no goods to be
shipped at any point north of Wilmington, with the single
exception of Goldsboro.

Now according to the decision in *Branch's case, supra*, it is at this point that the defendant was most at fault, and utterly without any justification. It is there said, that the chief object sought to be attained by the statute is the *protection of local shippers*, for whose benefit and by whose money the road was principally built, and to prevent their being sacrificed because of the complete monopoly which the company enjoys, as against them, in the effort to secure freight from Wilmington and points further south. It is expressly declared, also, that while it is the duty of railroad carriers to provide for all freight offered, through as well as local, still, if for any unexpected reasons they cannot accommodate all, their first and highest duty is to their local customers, whose wants they are bound to foreknow and provide for; that to these they owe an *absolute* duty, while to the others, but a reasonable one.

As I view it, this court has never rendered a decision more important in its consequences, and so nearly affecting the every day interests and welfare of the people of the state, as this one in *Branch* v. *R. R. Co., supra*. It was delivered after much consideration, as is shown by the learning and sound reasoning it displays; and believing it to be supported by the highest considerations of public utility, I confess, it is with the deepest concern that I see its principles departed from, as seems to me to have been done in the decision of this case.

PER CURIAM.                              Reversed.