It appears from the record that for some ten years prior to 11 October, 1903, the passenger traffic from a large portion of Eastern North Carolina to Raleigh and the adjacent central part of the State was made by the defendant Atlantic Coast Line Railroad Company connecting with the Southern Railway at Selma at 2:50 p. m. daily. For a year or two prior to that day the connection became very irregular, to the great *Page 32 
inconvenience of the traveling public, passengers frequently being compelled to lie over at Selma till 11 o'clock at night and then forced to take a mixed train with uncomfortable accommodations to go westward. The Southern Railway finding its time between Goldsboro and Greensboro, thirty-eight miles per hour, dangerous on account of the condition of its track, had also lately changed its schedule to leave Goldsboro thirty minutes earlier. The matter being called to the attention of the Corporation Commission, it attempted to remedy the evil. After much correspondence with the officials of both roads, the Commission on 8 December, 1903, made the following order:
Whereas, the convenience of the traveling public requires that close connection be made between the passenger trains on the Atlantic Coast Line Railroad and the Southern Railway at Selma daily in the afternoon of each day; and whereas it appears that such close connection is practicable, it is ordered that the Atlantic Coast Line Railroad arrange its schedule so that the train will arrive at Selma at 2:25 p. m. each day, instead of 2:50 p. m., as the schedule now stands. It is further ordered that if the Atlantic Coast Line trains have passengers en route for the Southern Railway and are delayed, notice shall be given to the Southern Railway, and that the Southern Railway shall wait fifteen (3) minutes for such delayed trains upon receipt of such notice. This order shall take effect 20 December, 1903.
 By order of the Commission: FRANKLIN McNEILL, Chairman.
H. C. BROWN, Clerk.
This order quickened the arrival time of the Atlantic Coast Line train at Selma twenty-five minutes, but as it required the Southern to wait at that point fifteen minutes for delayed trains, it more than divided the time between the roads, exacting only ten minutes advance of time on the part of the defendant to procure this convenience to the traveling public. On 18 December, 1903, on the application of counsel for the defendant, the order was suspended and both companies were notified to appear before the Corporation Commission at Raleigh, on 12 January, 1904, that "the matter of the connection at Selma of the Atlantic Coast Line going south with that of the Southern Railway going west in the afternoon" might be heard, and asking both companies to have representatives present. The defendant appeared by its superintendent and its general counsel, and the other company was also represented. After hearing both sides, "the situation being thoroughly discussed," the Commission took the matter under advisement. On 1 January, 1904, the Commission rendered a full finding of the facts, concluding with this judgment: *Page 33 
"And it is therefore ordered that the Atlantic Coast Line Railroad Company furnish transportation for passengers from Rocky Mount to Selma after 12:50 and by and before 2:25 p. m., each day. It is further ordered that the Southern Railway hold its train, No. 135, at Selma fifteen minutes, if for any reason the Atlantic Coast Line train connecting at that point is delayed." It was further ordered that the order should take effect 26 January, 1904. To this judgment the Southern Railway Company did not except. The Atlantic Coast Line filed five exceptions: 1. That it was not practicable to make the connection at Selma by extending the run of either its (4) Plymouth or its Springhope train at Selma. 2. That it would be unprofitable and a loss for it to make the connection by putting on an additional train from Rocky Mount to Selma. 3. The Commission has no power to require it to put on extra trains. 4. That it is not practicable to make the connection without putting on an extra train, which the Commission has no power to do. 5. That the order is unreasonable because passengers from Rocky Mount can make connection at Goldsboro at 6:50 a. m. or at Selma by night train over the Southern, or they could go up to Weldon and go over the Seaboard Railroad. A letter in the record from the transportation department of the defendant company, dated 23 January, 1904, states that prior to the breaking of connection at Selma the defendant's 2:50 p. m. train transported on an average of twelve passengers daily for the Southern at Selma, while since the average was only two. This shows 3,650 passengers annually inconvenienced by the failure to connect at that point. There is evidence elsewhere in the record that it was a very much larger number. On 2 February, 1904, the exceptions were heard by the Commission upon the testimony of witnesses offered by the defendant, and other evidence. Upon all the evidence and after argument by counsel for the defendant, the Commission, 13 February, 1904, made a fuller finding of fact, in the course of which it is recited, inter alia, that by the connection at Selma at 2:50 p. m. between the Atlantic Coast Line train No. 39 (southbound) and the Southern train No. 135 (westbound), "the greater portion of the section of the country reached by the said branch roads was for years furnished the nearest and cheapest route of travel to Raleigh and other Southern Railway points. The greater portion of the travel between the Atlantic Coast Line territory and the Southern Railway points was by this route. It is admitted in the correspondence of the Atlantic Coast Line in this matter that this was a most important connection, being the principal outlet for passengers (5) en route from Eastern Carolina territory to Raleigh and other Southern Railway points. There seems to have been no complaint about the failure of these railroad companies to keep this schedule and make *Page 34 
this connection until about the year 1900. The Atlantic Coast Line informs the Commission that `this matter has been a frequent source of correspondence between this company and the Southern Railway Company since 1900, and that during this time frequent complaints have been made to this company by the Southern Railway Company of its failure to make schedule time at Selma.'"
The Commission found, giving its reasons, that passengers ought neither to be required to go a much longer distance around by Weldon nor to make connection at unreasonable hours at Goldsboro (6:50 a. m.) nor make a night train (11 p. m.) connection at Selma, when a few minutes quickened time would maintain the connection which had been made at Selma in the early afternoon for more than ten years. The Commission also found that the defendant could make the connection, if it chose, by extending the run of its Springhope train which coming down nineteen miles from that place reached Rocky Mount at 12:10, where it lay over until 4 p. m. before returning to Springhope, during which four hours it could easily be run 41 miles and back, making this connection. It thus concludes its judgment:
There is within the territory served by these branch lines approximately 400,000 inhabitants. The report of the Atlantic Coast Line to this Commission for the fiscal year ending 30 June, 1903, shows net earnings from operation in North Carolina amounting to $1,943,116.63, and that there was a surplus of $1,293,983.54, after paying interest on its debts and 5 per cent dividends on its stock, both common and (6) preferred, from the net earnings of the company's entire line. On a mileage basis, this will show that there was a surplus of net earnings in North Carolina for that year of approximately $324,493. The Commission is of the opinion that the facilities given heretofore by the Atlantic Coast Line to the traveling public should not be lessened; that the connection furnished passengers from the Washington branch, the Norfolk and Carolina branch, the Plymouth branch and the Nashville branch with No. 135 Southern Railway passenger train at Selma, and also for all points between Rocky Mount and Selma, for nearly ten years should be restored; that if this cannot be done by the Atlantic Coast Line train No. 39 as formerly, on account of this train being heavier, containing usually one or more express cars, and in all usually ten or more cars, and on account of increase in business between Richmond and Selma, which necessitates longer stops, then other facilities should be furnished by the Atlantic Coast Line Company; that this connection, which was the principal outlet for passengers from Eastern Carolina to Selma and other Southern Railway points for the last ten years, instead of being abandoned, should be made permanent and certain, *Page 35 
and that this result be accomplished by carrying out the order heretofore made in this Court. It is ordered therefore that the exceptions be and they are hereby overruled.
FRANKLIN McNEILL, Chairman.
From this order, thus repeated the third time, and after the fullest investigation, occupying several months, the defendant appealed to the Superior Court. In that court the following issues were submitted, the Corporation Commission excepting:
1. Is it practicable for train No. 39 of the Atlantic Coast Line, due to arrive at Selma at 2:50 p. m., to make connection at Selma with train No. 135, westbound, of the Southern Railway, due to leave Selma at 2:25 p. m.? (7)
2. Is it practicable to make said connection by extending the run of the Plymouth train daily from Plymouth to Selma and return; and if so, what would be the additional expense?
3. Is it practicable to make said connection by the use of the Springhope train; and if so, what would be the additional expense?
4. In order to make such connection, would the defendant company have to run an additional train on its main line from Rocky Mount to Selma?
The court directed the jury to answer the first three issues "No," and the fourth issue "Yes," and the Corporation Commission excepted. The following issues the jury were permitted to answer, to which they responded as follows:
5. Is it practicable for said train to run the schedule prescribed in the plaintiff's order, having due regard to the number of trains and number of stops on the defendant's main line from Rocky Mount to Selma? "Yes."
6. What would be the daily cost of operating such train from Rocky Mount to Selma and return? "$40."
7. What would be the probable daily receipts from such train? "$25."
8. Is it reasonable and proper that for the convenience of the traveling public the defendant company should be required to make such connection? "Yes."
Upon the verdict the Corporation Commission moved for judgment, but the court rendered judgment for the defendant, giving as a reason that The Code of 1883, sec. 1957 (9), gave to railroad companies the right to regulate "the time and manner in which property and passengers shall be transported," and that it had been unable to find where this had been repealed; that he was of opinion that the statute had not conferred any power upon the Corporation Commission to order any connection to be made between the trains on connecting railroads, (8) *Page 36 
and hence he refrained from passing upon the defendant's further contention that the General Assembly had no constitutional right to grant such power. The Corporation Commission appealed, assigning several grounds of error which will appear in the opinion.
after stating the facts: For more than ten years the people of a large part of the eastern portion of the State, having occasion to come to the capital or to the adjacent central section, have found their most direct and convenient route to be via Selma, at which point by its schedule the southbound train No. 39 of the defendant Atlantic Coast Line delivered its passengers at 2:50 p. m. daily in time to connect with the Southern Railway westbound train No. 135 from Goldsboro to Greensboro. On 3 October, 1903, the Southern notified the Corporation Commission that owing to the condition of its track it was dangerous to maintain its speed — thirty-eight miles per hour — on its train No. 135, and proposed to leave Goldsboro thirty minutes sooner, which would cause its arrival a few minutes earlier at Selma. This the Commission found to be proper and reasonable. It was brought to the attention of the Commission by proper complaint made, that for many months the Atlantic Coast Line had failed to make this afternoon connection regularly at Selma at its schedule time, to the great inconvenience of the traveling public, and it was asked to order the afternoon connection to be resumed and observed. After much correspondence with the officials of both roads the Commission on 8 December, 1903, ordered that the afternoon connection should be made, and to that end directed (9) that the defendant should quicken its schedule so as to arrive at Selma at 2:25 instead of 2:50 p. m. as before, an advance of twenty-five minutes, but as the same order required the Southern train to wait fifteen minutes whenever the Atlantic Coast Line was delayed for any cause, the order practically required the defendant to arrive ten minutes earlier. Objection being taken, the order was suspended and both companies were summoned before the Corporation Commission, and after investigation and argument on 16 January, 1904, the order was renewed. The Southern thereupon acquiesced in the order. The defendant alone filed exceptions, upon which testimony and argument were heard and the Commission renewed its order in the same terms, 13 February, 1904. On appeal by the defendant to the Superior Court, there were sundry issues submitted over the exception of the Corporation Commission. But as the order of the Commission appealed from *Page 37 
simply directed the connection to be made as in former years, prescribing no details of the method (which was left to the judgment of the defendant itself) save an accelerating of twenty-five minutes, subject to a delay of the Southern train of fifteen minutes, when the defendant's train should be late, we think the matter could have been and was fully disposed of by affirmative response of the jury to the eighth issue — "Is it reasonable and proper that for convenience of the traveling public the defendant company should be required to make such connection?" — taken together with the findings upon the sixth and seventh issues; that even if an additional train should have to be put on between Rocky Mount and Selma, the loss to the defendant would be $15 per day (which might be overcome by the increased travel induced by certainty of connection), and the official returns made by the defendant to the Commission 30 June, 1903, as required by law and which are in the evidence, that the net earnings of the defendant from its operations in North Carolina amounted for the year ending 30 June, 1903, to $1,903,116.63, with a surplus of nearly $1,300,000 after paying (10) interest on its debts and 5 per cent dividends on its stock, both common and preferred, from the net earnings of the entire line. It is surely sufficiently large, as it stands, to justify the affirmation of the order of the Corporation Commission that this great inconvenience to the public should be avoided, even at a cost to the defendant of $15 per day, when the net earnings of the defendant from all its operations in this State approximate $2,000,000 annually, and the net surplus of the defendant's whole system, after payment of interest on its debts and dividends on its stock (whether watered or not), amounts to near $1,300,000 annually. And upon such verdict the judge below should have entered judgment affirming the order of the Corporation Commission, and we should reverse his judgment and enter such judgment here, provided (1) the Legislature has conferred such authority upon the Commission, (2) and the Legislature was not restrained by any provision of the State or Federal Constitution from granting such authority. Mr. Davis, the able and accomplished counsel of the defendant, states this clearly in his brief: "The defendant's contentions in brief are as follows: 1. That the Corporation Commission had no power or authority to make the order in question in this cause. 2. That the order is in violation of the Constitution of the United States and the State of North Carolina. 3. That the order is unreasonable and unjust." His third contention is settled by the verdict and findings as above stated. As to the first proposition, we think the General Assembly clearly intended to confer and did confer the power upon the Commission to order connection made by any two railroads when the public convenience required it, and the order was just and reasonable. This is not an arbitrary power, for, as *Page 38 
(11) in this case, such order is subject to review by a judge and jury on an appeal, to the Superior Court, whence a further appeal lies to this Court.
Section 1 of the Corporation Commission Act (Laws 1899, ch. 164) in enumerating the qualifications, the duties and powers of the Commission, provides that "they shall have such general control and supervision of all railroad . . . companies or corporations and of all other companies or corporations engaged in the carrying of freight or passengers . . . necessary to carry into effect the provisions of this act." Section 21 of the act provides that "All common carriers subject to the provisions of this act shall, according to their powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines and for the forwarding and delivering of passengers and freight to and from their several lines and those connecting therewith . . . and connecting lines shall be required to make asclose connection as practicable for the convenience of the travelingpublic." This provision is positive, clear, and mandatory. Common carriers are (1) to afford all reasonable, proper, and equal facilities for the interchange of traffic and forwarding freight and passengers. This would include both the place and time of delivery and forwarding of passengers and freight. The terms of the law are general and cannot be interpreted to mean alone the place at which passengers and freight are to be delivered; it does not mean simply facility for delivery, which might be confined to the place, but also requires facility for forwarding, which includes time as well, and prohibits such management as would produce delay in forwarding passengers. This requires close connection in point of time with connecting lines. (2) In the second place, common carriers are "to make as close connection as practicable for the convenience of the traveling public." The defendant insists that this last requirement means simply a physical connection, that is, a track connection. It is contended that the demands of the law would be (12) met by a simple joining of the railroad iron of one railroad to that of another, regardless of the time of the delivery of passengers at the junction, and of their finding the means of "traveling" on or continuing their journey, and of the delays and inconveniences resulting from a failure to make connection of trains. The statement of this proposition, even if the acts were ambiguous, contains its own refutation. But the language is plain and unequivocal, and, as Mr. Argo, of counsel for the Commission, well says, "The requirement is that `connecting lines shall make as close connection as practicable for the convenience of the traveling public.' This means that those railroads that have or pretend to have a physical connection, a connection of tracks, shall also have as close a connection of trains as practicable, in order *Page 39 
to secure the convenience of the `traveling public.' It is well known that the principal inconvenience attendant upon traveling arises from delays resulting from failure of trains to connect according to time schedules. It would contribute little to the convenience of the traveler to be dumped out upon a track making a `physical connection' and be compelled to wait for hours, frequently without food or adequate shelter and in the night, for a train upon which he might proceed on his way. The connection required is one of trains as well as of tracks. The public cannot travel upon a track alone, nor upon a train without a track; both are required to furnish facilities for traveling at all, and a close connection of both to secure the convenience of the traveling public."
It is true that section 1957 (9) of The Code of 1883, originally enacted in 1871-'72, gave to railroad companies themselves the right to "regulate the time and manner in which passengers and property shall be transported," but by Laws 1891, ch. 320, creating a Railroad Commission, the State made a radical change in its attitude towards railroads. It asserted its power to supervise and regulate their con- (13) duct, forbade discrimination and issuance of free passes, conferred upon the Railroad Commission the power to regulate and to fix their charges for freight and passengers, to prohibit rebates, to make joint through rates, to make personal visitation of all railroad offices and places of business, to examine their officers, agents, and employees under oath, to require all contracts and agreements between railroads, as to their business in this State, to be submitted for approval, to require annual reports from the railroads, to require the railroads to make repairs to their tracks and additions to or changes of their stations, forbade the abandonment of any station without the permission of the Commission, to require (if the Commission saw fit) separate accommodations for the races at the stations and in the cars, and "that connecting lines shall be required to make as close connection as practicable for the convenience of the traveling public," and many other matters which before that had been left to the railroads themselves. This act was passed after the fullest discussion for years before the people of the State. It expressed their deliberate conviction that the time had arrived when the State, in the public interest, should supervise and control the charges and the conduct of common carriers, including express companies, telegraphs, telephones, and steamboats. Similar legislation had preceded our act in England, in the Federal Congress, and in many of our sister states. Similar legislation has now been adopted in most of the states. Laws 1891, ch. 320, modified The Code, sec. 1957 (9), certainly to the extent that the right formerly conferred on railroad companies of fixing the time of running their trains was made subject to the power of the Commission to require connections to be made, wherever *Page 40 
public convenience should require this to be done, and the order was reasonable and just. The act had a repealing clause as to all previous legislation in conflict with it. The present act of 1899 renewed (14) the general provisions of the Railroad Commission Law, with some extension of its powers and changes, but reenacting verbatim
the provision requiring connections to be made and giving the Corporation Commission "general control and supervision of all railroads," with all powers "necessary to carry out the provisions of this act."
In this case the excuse of the defendant for its often missing connection at Selma since 1900 is that train No. 39 was a through train and that its increase in business made it more difficult to get to Selma in time. It may be natural that the officers of the company, looking to profits, should prefer the through business to the neglect of the convenience of the people of North Carolina, and should be reluctant to avoid the delay caused by heavy through business by putting $15 per day of its profits into affording the required convenience by an additional train if necessary. But it is precisely because just and proper regard for public convenience did not always coincide with the largest profit to the corporation that the State had to enact a statute giving to the Corporation Commission the power to regulate their rates, require suitable connections to be made, and a general supervision of their conduct. An act of the Legislature or order of the Commission reducing the defendant's charges for freight and passengers many hundreds of thousands of dollars would be valid if it left enough profit, over running expenses, "with economical salaries and management (of which the court will judge) to pay interest on its bonafide debt and some profit to stockholders." Wellman v. R. R.,143 U.S. 339. It follows that this order, even if it cost the defendant $15 per day, is in the power of the Commission, if it serves public convenience.
The other point, as to the constitutional powers of the Legislature to so enact, is also well settled. The general power of the Legislature to provide reasonable rules and regulations, directly or through a commission, has been held by us in Express Co. v. R. R., 111 N.C. 472, (15) 32 Am. St., 805; in Corporation Commission v. R. R., 127 N.C. 288, and cases there cited. Among the Federal decisions, this was asserted in Munn v. Illinois, 94 U.S. 113, and has been reiterated in numerous cases since, collected 9 Rose's Notes, pp. 21-55. The doctrine is thus stated in People v. Budd, 117 N.Y. 5 L.R.A., 566, 15 Am. St., 460: "Common carriers exercise a sort of public office and have duties to perform in which the public is interested. Navigation Co. v.Bank, 6 How., 382. Their business is therefore affected with a public interest within the meaning of the doctrine which Lord Hale has so forcibly *Page 41 
stated. But we need go no further. Enough has already been said to show that when private property is devoted to a public use it is subject to public regulation."
This has been repeated over and over again in all the courts. Citation of authorities would be a work of supererogation. If the public can regulate the charges of a common carrier, so that only it is not deprived of all profits, as is held in Wellman v. R. R., 143 U.S. 339, and Dow v.Beidelman, 125 U. C., 680, it can certainly require a connection for the accommodation of thousands of our people, even if, at the utmost, it requires a loss of $15 a day out of a railroad company making $2,000,000 net earnings annually out of its operation in this State.
It is not necessary that the particular service required shall be profitable if the total earnings in this State show a profit. It is precisely because some particular service, which the public comfort or convenience may require, is not profitable that the company declines to render it. It prefers to work the soft spots, the best paying ore only, and it is precisely for that reason that the Commission is vested with the power to require those things to be done, if reasonable and just (not necessarily profitable), as to which there is the protection of an (16) appeal to the Superior Court and a further review here.
In R. R. v. Gill, 156 U.S. 664, the Court affirming the Supreme Court of Arkansas in same case (54 Ark. 112) says that the common carrier cannot "attack as unjust a regulation which fixes a rate at which some part would be unremunerative . . . To the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated." In R. R. v. Minnesota,186 U.S. 261, the Court says that if upon the whole operations in hauling coal the road makes a profit, the requirement as to a fair profit upon investment is satisfied, notwithstanding under the order of the Commission there would be a loss in hauling at the rate fixed in carload lots. In R.R. v. Minn., supra, the Court say: "We do not think it beyond the power of the State Commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit upon their entire business, and the burden is upon them to impeach the action of the Commission in this particular." In Cantwell v. R. R., 176 Ill. 512, the Supreme Court of Illinois laid down the same doctrine thus: "The sufficiency of the earnings of a railroad to justify the expense of running a separate passenger train over a certain branch line constituting part of the entire system is not to be determined by considering the profits of that branch alone, but of the whole business of the various parts of the roads operated with the branch as one continuous line." In R. R. v. R. R.Commission, 109 La. 247, the Supreme Court of that State, through Nichols,C. J., in defining the *Page 42 
powers possessed by the Railroad Commission, says: "They extend to matters concerning public comfort and convenience, and in the consideration of matters of comfort and convenience the number of persons who may be concerned or interested in some particular matter at some particular point enter as important factors in determining what is (17) to be done. The Commission cannot ignore the comfort and convenience of numbers of citizens on a line of travel or conveyance to base their action exclusively upon a consideration of the amount of dollars and cents which may be involved. . . . In the present issue it cannot be claimed that the Southern Pacific road, either in the operation of its line as a whole or that part of it which falls within the limits of Louisiana, has not been and is not remunerative; nor can it be said that the Morgan Railroad Company is not a paying corporation. . . . We do not think the point is made that after the business of the railroad corporation had made it fairly remunerative, the Commission is without general authority to direct that a portion of the `surplus' profits (if that expression can be used) should be applied to the promotion of the comfort and convenience of the people along the line of road. When such a point in the business of the road is reached, the rights of the `general public' come clearly in view."
In U.S. v. Freight Assn., 166 U.S. 322, the Court says: "It must also be remembered that railways are corporations organized for public purposes, have been granted valuable franchises and privileges (and among such the right to take private property of citizens is not the least), and that they all primarily owe duties to the public of a higher nature even than that of earning large dividends for their shareholders." In Gladsonv. Minn., 166 U.S. 430, the Court says: "The State which created the corporation may make all needful regulations of a police character for the government of the company while operating its road within the jurisdiction; it may prescribe the location and the plan of construction of the road and the rate of speed at which the trains shall run and the places at which they shall stop, and may make any other reasonable regulations for their management in order to secure the object of its (18) incorporation and the safety, good order, convenience, and comfort of its passengers and of the public." In Wisconsin v. Jacobson,179 U.S. 296, the Court says: "That railroads from the very outset have been regarded as public highways, and the right and duty of the Government to regulate, in a reasonable and proper manner, the conduct and business of a railroad corporation have been founded upon that fact. Constituting public highways of a most important character, the functions of proper regulation by the Government spring from the fact that in relation to all highways the duty of regulation is governmental in its nature. At the present day there is no denial of these propositions. *Page 43 
The companies hold a public franchise, and governmental supervision is therefore valid. They are organized for the public interests and to subserve primarily the public good and convenience."
It is needless to multiply authorities. As the United States Supreme Court says in the last-cited case, the defendant was granted incorporation by the State "to subserve primarily the public good and convenience." If all those things required for the public convenience or comfort were profitable per se to the company, a Corporation Commission would not be necessary to compel the adoption and operation of such betterments. In Waterworks v. Schottler, 110 U.S. 347, it was held that the Legislature may regulate gas and water and other like companies, and require them to furnish their customers at prices to be fixed by the municipal authorities of the locality, and in R. R. v. Bristol,151 U.S. 556, that the Legislature could require, even as to railroads already built, the removal of grade crossings at railroad expense. Certainly, then, the police power extends to authorizing the State Corporation Commission to require two railroad companies to make connection. The Corporation Commission, after three several investigations, has found that this connection would subserve that end. The jury, after an overwhelming array of evidence which we have not deemed it (19) necessary to recapitulate or cite, has so found. The statute clearly gives the power, and the authorities are beyond question that the Legislature could confer it. Requiring two railroads to make connection is the exercise of a far less power than making rates or compelling the erection of union depots at such junctions.
While we must reverse the decision below and affirm the judgment of the Corporation Commission, in view of the novelty and importance of this class of litigation, it is well to take notice of some of the exceptions taken by the Commission.
It was error to direct a verdict upon the first four issues. Upon the first issue, whether it was practicable to make connection by train No. 39, and the second issue, whether it was practicable to make connection by extending the run of the Plymouth train to Selma, there was a conflict of evidence, and the issues were of fact, and (if material) should have been submitted to the jury. More especially was this true since the order of the Commission was presumed to be valid and the burden was on the defendant to show otherwise. R. R. v. Minn., 186 U.S. 264. On the third issue, as to the practicability of running (20) the Springhope train to Selma in the four hours that it lies over at Rocky Mount, the evidence was uncontradicted that this could be done, and there was even evidence from two reputable witnesses which proved (if believed by the jury) that the costs of the extra run would be *Page 44 
only $10, showing a profit of $15 daily. the excuse that the engine was used for shifting at Rocky Mount, or that, being a wood-burner, a small stand for wood would need to be built at Selma — the other engines being coal-burners — did not deserve to be considered against the inconvenience to thousands of the public caused by failure to make this connection. It follows that it was error to instruct the jury in response to the fourth issue to find that the connection could only be made by an additional train from Rocky Mount to Selma.
[EDITORS' NOTE: THE MAP IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 137 N.C. 44.]
The first seven issues were irrelevant and immaterial. The motion of the plaintiff for judgment upon the verdict should have been granted. The eighth issue, "Is it reasonable and proper that for the convenience of the traveling public the defendant company should be required to make such connection?" was answered "Yes." This was the only material issue, and upon that finding alone the judgment should be entered here. This view is strengthened by the "inspection of the whole record," which shows that the findings upon the sixth and seventh issues are that if the connection were made by the most expensive of the four methods named, the loss was only $15 per day, and the report of the defendant to the Corporation Commission, which is in the record, that its annual net earnings in this State were nearly two millions of dollars. This shows the correctness of the finding upon the eighth issue as to the reasonableness of the order, even in the most adverse view.
The court has the power to enter final judgment here, and on proper occasions has done so. The Code, sec. 957; Alspaugh v. Winstead, (21) 79 N.C. 526; Griffin v. Light Co., 111 N.C. 438; Cook v. *Page 45 Bank, 130 N.C. 184. Final judgment has been entered here, not infrequently, by order and without opinion, as a matter of course. InBernhardt v. Brown, 118 N.C. 710, 36 L.R.A., 402, it is said: "If this Court reverses or affirms the judgment below, it may in its discretion enter a final judgment here or direct it to be so entered below. By preference, and as a matter of convenience, the latter course is, unless in very exceptional cases, the course pursued, especially since Laws 1887, ch. 192." In Caldwell v. Wilson, 121 N.C. 473, which resembles this case in being a matter of public interest and not a judgment for money, it was held, "the judgment must therefore be affirmed, but in view of the public interests involved, we deem it proper not to remand the case, but to enter final judgment in this Court," which was done — ousting the defendant from the office and seating the relator. Among many other cases in which final judgments were entered here is White v. Auditor, 126 N.C. 584, and similar cases, in none of which the dissents were upon the power of this Court to enter final judgment here. The Code, sec. 957, provides as to this Court: "In every case the Court may render such sentence, judgment, and decree as on inspection of the whole record it shall appear to them ought in law to be rendered thereon." Rule 49 of this Court provides for "a judgment docket of this Court" with references to entries as to different causes of action in which recovery is adjudged, and Rules 50 and 51 for the issuance of executions from this Court on its judgments.
In this matter there has already been a year's delay. The inconvenience to the public continues each day. The act of the Legislature for that reason expedites the hearing of these causes by giving them precedence of all other civil cases. Judgment will therefore be entered here reversing the judgment of the Superior Court, and affirming (22) in all respects and declaring valid the order of the Corporation Commission made in this case, 13 February, 1904. That order simply directed the defendant to make the connection daily at Selma at the time mentioned therein, without specifying whether this should be done by quickening the speed of train No. 39 or by extending the run of the Springhope or the Plymouth train, or by putting on an extra train from Rocky Mount to Selma, and our judgment leaves to the defendant the same liberty of choice as to the mode in which it shall put into effect the order of the Commission. Owing to the possible necessity of making preparations to comply with this judgment, there will be a cessatexecutio till 10 February, 1905, entered on the judgment docket of this Court, and until that date no mandate shall issue to the defendant upon this judgment. The judgment of the Superior Court is
Reversed. *Page 46