STATE EX REL. CORPORATION COMMISSION v. THE SOUTHERN RAILWAY COMPANY AND THE ATLANTIC COAST LINE RAILROAD COMPANY. THE SELMA STATION CASE.

(Filed 11 April, 1923.)

1. **Corporation Commission—Railroads—Orders—Statutes—Appeal—Exceptions—Waiver.**

Where, according to the statute applicable, the citizens of a town have petitioned the Corporation Commission to require two railroad companies to erect a union station at a junction, and after due hearing and investigation the commission has entered an order requiring the railroad companies to erect the station, from which no appeal was taken; and at the request of the companies based on conditions growing out of the World War, the commission has suspended the effect of its order for several years: *Held,* the order previously entered by the commission was one authorized by valid statutes (C. S., 1041, 1042), and complete and final

in its effect, requiring an exception entered within the statutory time to have the matter reviewed by the Court, and the action of the commission in suspending the time of the operating effect of the order, at the railroads' request, and in consideration of their financial condition under the circumstances, until such time as these conditions were found by it to have so changed as to make the order unoppressive, was not of such character as to give the railroad companies the statutory right of excepting and appealing from the date of its effectiveness, or relate back to the filing of the original order; and *held further*, under the facts of this appeal the railroad companies had waived their right to have the order reviewed by the Court.

**2. Corporation Commission—Railroads—Statutes—Remedial Statutes.**

C. S., 1041, 1042, conferring authority upon the Corporation Commission to compel railroad companies to erect stations upon a single line of road, and union stations at junctions etc., are of a remedial nature, and will be liberally construed by the courts in favor of the exercise of the authority conferred.

**3. Railroads—Union Stations—Condemnation—Corporation Commission —Orders.**

C. S., 1708, confers upon any railroad company the right to condemn land for the purpose of getting to a union depot required by the order of the Corporation Commission to be built.

**4. Corporation Commission — Orders — Final Judgments—Mandamus— Railroads—Statutes.**

Where the Corporation Commission has ordered two railroad companies to erect a union depot at a junction after a hearing upon the petition of the citizens of the town, and the railroads have lost or waived their statutory right to appeal, such order is regarded as a final judgment, and mandamus proceedings to compel the enforcement of the final order upon failure of the railroads to except and appeal therefrom is the remedy authorized by the statute applicable. C. S., 1103.

**5. Corporation Commission — Railroads—Statutes—Mandamus—Recordari—Actions—Consolidated Actions.**

Where the Corporation Commission has ordered two railroad companies to build a union station at their junction, and upon the failure of the railroad companies to except and appeal to the courts under the requirement of the statute, the commission has afterwards refused to send up its record to the courts, and the railroad companies have applied to the Superior Court for a *recordari*, when proceedings for mandamus brought by the commission to enforce its order is therein pending: *Held*, the proceedings under the provisions of the statute should be entitled "State *ex rel.* Corporation Commission against the railroads so acting," etc., and the two causes may be consolidated or heard together on appeal to the Supreme Court, the decision of the one depending upon the decision of the other.

**6. Corporation Commission — Courts — Records—Appeal—Exceptions— Statutes—Railroads.**

The Corporation Commission is a court of record, C. S., 1023, and it must appear thereon that a railroad company claiming an extension of

time to file exception to the commission's order has done so, and no alleged parol agreement for an extension of time will be considered.

**7. Corporation Commission—Railroads—Orders—Appeal—Notice of Appeal—Agreements.**

The statutory notice of an appeal by a railroad company from an order of the Corporation Commission is mandatory and cannot be extended by the consent of the parties of record.

**8. Commerce—Railroads—Intrastate Roads—Junctions—Stations—Statutes—Federal Transportation Act.**

A leased railroad by a carrier wholly within the State is an intrastate road, nor can it be otherwise regarded because crossed by an interstate carrier at one of its intermediate stations with which it exchanges passengers and freight; and an order of the Corporation Commission that these railroads build a union depot at this junction required for the safety and convenience of the passengers comes within the police powers of the State so far as it relates to the intrastate carrier, and cannot be held as contrary to the provisions of the Federal Transportation Act, giving the Interstate Commerce Commission certain authority to regulate conditions at terminal points, etc., this act not including the building of stations, and expressly excepting from its provisions the right of the State, in the exercise of its police powers, to require intrastate railroads to erect depots upon their lines of road.

**9. Same—Constitutional Law—Interstate Commerce.**

The order of the Corporation Commission for the joint erection by an intrastate carrier and an interstate carrier of a union station at a junction cannot be regarded as objectionable so far as it relates to the intrastate carrier, as a burden on interstate commerce, when it appears that the commission was passing upon the petition of only a few cities or towns in the State separately and not as a part of a State-wide scheme, and the expenditures required were in amount too small to affect such commerce.

**10. Statute — Interpretation—Prospective Effect—Federal Transportation Act.**

The Federal Transportation or the "Esch-Cummings" Act is prospective in its enforcement, and cannot relate back to a final order of the State Corporation Commission not appealed from, for the erection of a union station where the lines of an intrastate and interstate carrier cross each other, the execution of which has been stayed by the commission until after the passage of the Federal statute solely for the advantage of the carriers at their request.

**11. Statutes—Interpretation—Prospective Effect.**

Retrospective laws are generally regarded as dangerous to liberty and private rights, and such effect will not be given them by the courts unless the Legislature has explicitly declared in proper instances its intention that they should so operate ; or unless such intention appears by necessary implication from the nature and words of the act so clearly as to leave no room for a reasonable doubt on the subject.

**12. Same—Legislative Committee Explanation—Amendments Offered and Rejected.**

In construing the Federal Transportation Act in this case, consideration is given to the explanation of the chairman of the committee in Congress,

having the bill in charge, which had its effect in defeating an amendment that it apply to union depots at points that were not termini of the interstate carrier, such consideration being permissible under the opinions in several cases decided in the United States Supreme Court.

**13. Commerce—Statutes—State Police Powers—Rights Reserved—Congressional Omission to Act.**

Where Congress has refrained from regulating interstate commerce in certain particulars, such powers in these instances are reserved in the State in the exercise of its police power, and the State may reasonably require intrastate carriers to construct union depots along its line at junctional points with the line of an interstate carrier, especially when it will not interfere with interstate commerce, or when it is an aid to it.

**14. Appeal and Error — Final Judgments — Corporation Commission—Mandamus—Cause Retained—Judgments.**

It appearing on appeal from the record in this case that an alternate writ of mandamus allowing the defendants an opportunity to be heard before the issuance of the peremptory writ, from the Superior Court, would not have advantaged the appellant; final judgment is entered in the Supreme Court that a peremptory mandamus issue, that defendant comply with the order of the Corporation Commission and proceed to construct the station with reasonable diligence, retaining the cause for the present for such further orders and directions as in the opinion of the Supreme Court may be required.

HOKE, J., concurring; Stacy, J., concurring in the concurring opinion.

APPEAL by Southern Railway Company from *Cranmer, J.,* 29 January, 1923, from WAKE.

On 11 September, 1914, the Corporation Commission of this State made an order requiring the Southern Railway Company and the Atlantic Coast Line Railroad Company to jointly construct and maintain a depot or station at Selma, North Carolina, for the use and accommodation of the public entitled to use the same and enjoy the facilities thereof. It appears, and is also admitted, that this order, the exact terms of which will hereafter appear, was not appealed from or in any way reversed or modified, though its enforcement, under the statute, was stayed or postponed, for the reason appearing in the record, and as a matter of favor to the respondents, the railroads, until its enforcement was required by the Corporation Commission when the reason for the stay no longer existed.

In order to clearly understand the successive steps taken in the course of this proceeding from and including 10 September, 1914, to the present time, it will be well to state, at least substantially, the proceedings in the matter as they will hereafter appear, and which are extracted from the record, pages 6 to 18, both inclusive.

### BETTER DEPOT FACILITIES.

Town Officers and Citizens of Selma v. The Southern Railway Company and Atlantic Coast Line Railroad Company.

Ordered, that the Atlantic Coast Line Railroad Company and the Southern Railway Company proceed with the construction of a union passenger station at Selma, N. C., in accordance with plans submitted by the Atlantic Coast Line Railroad Company, 9 January, 1917, and substantially on the site of the present passenger depot at Selma, and that the construction of same be completed within six months from this date.

### ORDER OVERRULING EXCEPTIONS.

*In re* Passenger Stations for Kinston, Selma, Newton, and Plymouth, N. C., Commissioner's Order of 11 April, 1922.

Upon consideration of the exceptions filed in the above cause by the Carolina and Northwestern Railway Company, as to Newton; the Southern Railway Company, as to Newton and Selma; the Atlantic Coast Line Railroad Company, as to Kinston and Plymouth, and the Norfolk Southern Railroad Company, as to Kinston and Plymouth, it is ordered that the exceptions in each case be and they are hereby overruled.

By order of the Commission, this 20 May, 1922.

R. O. SELF, *Clerk.*

### IN RE UNION PASSENGER DEPOT.

Citizens of Selma, North Carolina, v. Atlantic Coast Line Railroad Company and Southern Railway Company.

By the Commission: Upon consideration of the record in this cause, we find that formal petition was filed with the Corporation Commission 1 July, 1913, alleging inadequacy of passenger depot accommodations maintained by Atlantic Coast Line Railroad Company and Southern Railway Company at Selma, N. C.; that after due notice to defendant railroad companies, formal hearing was held by the Corporation Commission at Selma, N. C., on 9 April, 1914, at which hearing both of the defendant railroad companies were represented by counsel, and that, based upon the evidence produced at said hearing, the Commission made its order of 10 September, 1914, directed to the Southern Railway Company and the Atlantic Coast Line Railroad Company, finding that the said passenger depot accommodations were inadequate, and ordering that the defendant railroad companies erect at Selma, at the junction point, a station adequate for their future needs, and that the plans for the proposed station be submitted to the Corporation Commission by 15 October,

1914, for its approval. Copies of said order were served upon each of the defendant railroad companies, and no exceptions to the said order were filed by either of them, but on 6 October, 1914, nine days before expiration of the term for filing the said plans, an officer of the Southern Railway Company appeared before the Corporation Commission and presented the extraordinary financial difficulties confronting the carriers at that time by reason of conditions produced by the European War, and presented the plea that because of such conditions the carriers be granted indulgence with respect to. expenditures for improved facilities until such time as their financial conditions should improve. The following response was made to this plea for indulgence:

### NORTH CAROLINA CORPORATION COMMISSION.

RALEIGH, N. C., 7 October, 1914.

DEAR SIR:—The Corporation Commission has given very careful consideration to your request, made on behalf of the Southern Railway Company, that this Commission extend to the company such consideration and leniency as it properly could during the continuance of the present depressed conditions, and especially that your company be relieved as far as possible from making improvements in facilities, stations, etc., until its greatly decreased earnings again become normal.

We are convinced from the full and frank statements made to us of your financial condition and your earnings for the last three months, which show increased losses from week to week, that the earnings of the company are not more than enough to meet its actual operation expenses, and that in order to do this the company will have to practice economy and retrenchment.

Under these circumstances it appears to us that it would be unreasonable, and not expected by the public, that you should be required to make improvements which could reasonably be postponed.

We therefore advise that until there is an improvement in conditions we will not require the company to make improvements in facilities, stations, etc., except where there is some peculiar necessity for immediate action.

In respect to applications for improved service and facilities pending before us, we will probably proceed to hear them and determine what improvements will be ultimately required so that the public may know what to expect, but these improvements will not be required to be made until there is an improvement in present conditions, except in cases of urgent necessity.

The foregoing letter was not in any sense a revocation of the order of 10 September, 1914, but merely a concession that further time would be permitted for its observance.

The indulgent policy of coöperation with the carriers indicated in this letter was continued until after the war period, when from time to time the matter of urgent need for better passenger depot accommodations at Selma was urged upon these defendant companies without adequate response, and on 2 March, 1922, notice was given each of these defendant companies that the matter of station facilities at Selma would be further heard. The Southern Railway Company was not represented at that hearing, and after the said hearing the Commission made its order of 11 April, 1922, reviewing conditions under which there had been delay in compliance with the Commission's order of 10 September, 1914, and an order was made that the Atlantic Coast Line Railroad Company and the Southern Railway Company proceed with the construction of the union passenger station at Selma in accordance with plans which have been submitted and approved, and that the construction of same be completed within six months from 11 April, 1922. No exception to this order was filed by the Atlantic Coast Line Railroad Company, and that company announced its readiness to proceed with its part of compliance with the said order.

The defendant Southern Railway Company did, on 8 May, 1922, file exceptions to the said order, which said exceptions were overruled, whereupon the Southern Railway Company filed notice of appeal, without bond for cost, and requested that the record and exceptions thereto be transmitted to the Superior Court, in term, of the county as authorized by law.

The said exceptions of the Southern Railway Company were overruled, and its application to have the record in this case certified on appeal has not been granted for that:

1. The said order of 11 April, 1922, was not an order affecting the legal rights of the Southern Railway Company, and was not, therefore, an order from which it would have a right of appeal. The legal obligation of these companies to construct an adequate passenger station at Selma became fixed under the order of 10 September, 1914, to which no exceptions were filed. The order of 11 April, 1922, imposed no additional obligation upon the Southern Railway Company, but merely ordered the defendant companies to construct a depot which they had been under legal obligations to construct since the order of 10 September, 1914.

2. The said exceptions to the order of 11 April, 1922, were not filed within ten days from the service of the said order as required by C. S., 1097, and were not filed until fourteen days after the expiration of said time, and no right of appeal could accrue to the Southern Railway Company by reason of said exceptions, even if the order of 11 April, 1922, had been an order affecting the legal rights of the Southern Railway Company.

3. No bond was filed by the Southern Railway Company with its notice of appeal to cover the costs of appeal.

4. The said exceptions of the Southern Railway Company were not only without legal effect, but the said exceptions presented no facts or conditions entitled to meritorious consideration, or that would have been entitled to meritorious consideration if they had been presented in apt time, as exceptions to the original order of 10 September, 1914.

Considering more particularly the several exceptions which, as we have held, can have no legal effect, we further conclude:

Numbers one and two: Exception that the order was issued without the defendant Southern Railway Company being given an opportunity to be heard, and exception that the defendant Southern Railway Company was not a party to the proceedings, are not supported by the facts in the case, as they appear in the record.

Number three: That the Southern Railway Company should not be required to participate in the cost of providing adequate depot facilities at Selma, since it has a contract with the Atlantic Coast Line Railroad Company to provide facilities at Selma for both lines on a rental basis. No such contract was proven, and could be given no consideration if proven, as the Southern Railway Company owes the obligation to the traveling public using its line to provide adequate accommodations for them, and it cannot by contract shift or evade this responsibility. If it has an enforceable contract with the Atlantic Coast Line to provide for it such facilities as are adequate for present necessity at Selma, it has had eight years since the order of the Corporation Commission of 10 September, 1914, in which to enforce such contract, and the courts remain open to it, but the Corporation Commission will not undertake to make the Atlantic Coast Line build depots for the use of the Southern Railway, and would have no legal authority to do so.

Number four: Exception that the Commission has recognized that the Atlantic Coast Line Company has responsibility for furnishing depot facilities both for the Southern and Atlantic Coast Line companies at Selma. This exception is not sustained.

Number five: Exception that the order required the defendant Southern Railway Company to participate in the construction, operation, and joint use of facilities under plans and specifications prepared by another railroad company. The said plans were submitted to the Corporation Commission by Mr. W. H. Newell, general superintendent of the Atlantic Coast Line Railroad Company. On 28 June, 1916, Mr. Newell wrote as follows:

"I beg to advise that I hope to be able to submit the plans to the Commission very shortly. They are now in the hands of the Southern Railway for approval." In his letter of 4 September, 1916, submitting

the said plans, Mr. Newell said: "The attached plans have been sub-mitted to the Southern Railway Company and approved." Upon this record, the Commission assumed that the said plans were submitted on behalf of both the Atlantic Coast Line Railroad Company and the Southern Railway Company, and that the said plans represented the view of both these companies as to a proper compliance with the order of the Commission of 10 September, 1914, to provide adequate depot accommodations at Selma. If it be denied that the said plans represent the concurrence and approval of the Southern Railway Company, as well as the Atlantic Coast Line Railroad, then the Southern Railway Com-pany is in default as to the order of 10 September, 1914, directed to the Southern Railway Company as well as to the Atlantic Coast Line Rail-road Company, and directing each of them to submit to the Corporation Commission for approval plans for adequate depot facilities at Selma; and, if it be that the Southern Railway Company defaulted as to its compliance with this part of the order, the Southern Railway Company is estopped from complaint because the Atlantic Coast Line Railroad Company did comply with the said order, and did submit proposals of suitable plans for this purpose, and because the said plans were approved and adopted by the Corporation Commission as meeting the demands of its order of 10 September, 1914.

The specification as part of exception number five that it owns more .of the land on which the depot is built than the Atlantic Coast Line offers no obstacle to the construction of the depot. There is a statutory remedy (C. S., 1042) by which the difference can be legally adjusted, if it cannot be adjusted by agreement. All of the necessary land is held by the two companies, and is now in joint use by the two companies as depot property.

.That the location requires more of the right of way of the Southern than of the Coast Line. It is of record that the Coast Line has proposed to the Southern, in writing, that the number of square feet of its right of way to be used for depot be offset against an equal number of square feet of the Southern's right of way, and that the Coast Line be charged a reasonable rental by the Southern for its partial use of the balance. No reply has been made to that proposal. If the Southern endeavors to reach agreement with the Coast Line on this feature, and fails, the Commission would at any time, upon application, require the Coast Line to pursue the statutory method of acquiring its equal proportion of the Southern's right of way for this purpose. The Southern has done noth-ing but take advantage of eight years of indulgence and then to interpose every possible technical difficulty and objection in order to evade the performance of its obligations to the traveling public at this point.

Exception number six is not sustained by the evidence.

Exception number seven: That the order makes no provision for an apportionment between the Atlantic Coast Line Railroad Company and the Southern Railway Company as to the cost of the construction and operation of the proposed new union station. The order of 10 September, 1914, directed the Atlantic Coast Line Railroad Company and the Southern Railway Company jointly to construct the said depot, and this order was based upon evidence presented at the hearing showing the volume of passenger traffic handled by the two companies at Selma to be about equal, the traffic of the Southern Railway Company being slightly greater than that of the Atlantic Coast Line Railroad Company as shown by reports submitted by these companies respectively of their receipts from ticket sales at the Selma station for the preceding year, as follows: Atlantic Coast Line, $28,304; Southern Railway, $30,452. These figures represent actual ticket sales at Selma, and do not include revenue from passengers who use the Selma depot between trains on through tickets.

It further appears in the record that the Atlantic Coast Line Railroad Company proposed to the Southern Railway Company by letter of 29 April, 1922, that each of these companies should bear an equal proportion of the cost of construction of the Selma depot, and that no response to this written proposal has been made by the Southern Railway Company. This basis of division of cost we find upon the facts in this case to be equitable as between the parties, and, if anything, liberal to the Southern Railway Company. If the latter company desired or expected the Commission to adopt any other basis for division as to the cost of construction of this depot, its exception should have been made to the order of 10 September, 1914, directing these two companies jointly to construct this depot. The defendant Southern Railway Company did not file such exception, and has at no time requested the Corporation Commission to make an apportionment of the cost other than an equal division of the same, which we find upon the record to be a proper basis of apportionment.

Exceptions numbers eight, nine, ten, and twelve are not supported by the facts as disclosed in the record.

And we say the same as to exception number eleven, and, besides, as to this exception the details of the said plans were not prescribed by the Corporation Commission, but the said plans, as hereinbefore stated, together with the materials to be used in the construction of the station, are plans prepared by the Atlantic Coast Line Railroad Company, and, as we are advised, submitted to and approved by the Southern Railway Company before submission to the Corporation Commission.

Exception numbers thirteen and fourteen: The premises and conclusion set out in these exceptions have no bearing upon the obligation

of the Southern Railway Company to join with the Atlantic Coast Line Railroad Company in the construction of a union passenger station at Selma. The figures of operating revenue, presented in this exception number thirteen, do not correctly or fully represent the operations of the Southern Railway system, or its operations within North Carolina, for the year 1921. Its report to this Commission for the year 1921 shows operating receipts in excess of operating expenses, $22,886,143.05; and for its lines within the State of North Carolina, $7,161,743.90. Its net earnings in North Carolina last year were 33⅓ per cent greater than the basis of a fair return fixed by the Interstate Commerce Act. Its quarterly reports for the first three quarters of 1922 show improvement in gross and net earnings over 1921, and in the present and last quarter of the year it is understood to be handling the largest volume of business in the history of the Southern Railway system.

The record in this case and the facts within the knowledge of the Commission show that Selma is an important point of passenger transfer. The larger part of the passenger travel between northeastern North Carolina and the rest of the State passes through the Selma transfer. There is a heavy exchange and transfer of passengers between the line of these defendant companies at Selma every day in the year. No shed protection is provided for this heavy transfer of passengers, and the waiting-room accommodations are totally inadequate for the normal flow of passengers who frequently have to wait long periods of time for connections. No modern conveniences are provided, and upon any occasion of extraordinary travel large numbers of passengers are required to detrain and wait, without any accommodations or protection from weather conditions, whatever they may be, as only a small number of them can take advantage of the poor quality of accommodations that are available.

We have taken the pains to review the several exceptions of the Southern Railway Company, not because they have, or can have, any controlling legal effect, but to ascertain if they present any basis whatever for meritorious consideration of defendant's rights, in the opinion of the Court.

The Southern Railway Company sought delay, not improperly it may be conceded, in the performance of this obligation to the public in 1914, and not as a legal right, but as an indulgence, in times of stress, consequent upon the close of the Great War, in the performance of a recognized obligation to the public, and on that should, for the reason assigned, be suspended for a time, at least, but resumed after the return of more prosperous times, and its ability to comply with said obligation to the public, after having advantage for eight years of the benefits of its pleas for indulgence.

CORPORATION COM. *v.* R. R.

We find upon review of this record that the Southern Railway Company has no basis for appeal, and is therefore not entitled to have the record certified on appeal, and it is ordered that notice be served upon the defendant Southern Railway Company that if it shall fail within ten days from this date to present evidence satisfactory to the Corporation Commission that it will proceed in good faith and without delay to join with the Atlantic Coast Line Railroad Company in the execution of the order of the Corporation Commission of 10 September, 1914, to construct adequate depot accommodations at Selma, N. C., in accordance with plans submitted and approved in pursuance of said order, appropriate action will be taken to enforce the said order and to impose such penalties as have been or may hereafter be incurred for refusing to obey the said order, in accordance with the provisions of C. S., 1106.

This 20 December, 1922.

This is to certify that the above is a true copy of the order of the Corporation Commission in this record dated as above.

R. O. SELF,
*Clerk, North Carolina Corporation Commission.*

NORTH CAROLINA CORPORATION COMMISSION.

RALEIGH, N. C., 4 January, 1913.

I, R. O. Self, clerk of the North Carolina Corporation Commission, do hereby certify the foregoing and attached fifteen sheets to be a true copy of the records of this office.

In witness whereof I have hereunto set my hand and affixed the official seal of the Commission.

Done in office at Raleigh, this 4 January, in the year of our Lord 1923.

R. O. SELF, *Clerk.*

On reverse side of complaint appears the following: "Service accepted 5 January, 1923, by attorneys of respective parties."

ORDER.

This cause coming on to be heard before me upon the verified complaint and exhibits in the cause, it is ordered that the defendants, the Southern Railway Company and the Atlantic Coast Line Railroad Company, show cause before Hon. E. H. Cranmer, judge holding the courts of the Seventh Judicial District in the courthouse at Raleigh, N. C., at 11 o'clock a. m. Monday, 29 January, 1923, why the relief prayed for by the plaintiff in this proceeding should not be granted. That a copy of this order and the complaint be served upon said defendants as provided by law.      THOMAS H. CALVERT,
*Resident Judge, Seventh Judicial District.*

On reverse side of order appears the following: "Service accepted 5 and 10 January, 1923, by the attorneys of respective parties."

Filed 10 January, 1923.

We direct attention here to what is called in the record the answer of the Southern Railway Company, but merely for information, and as conducive, perhaps, to a better understanding of the facts and the position of the company, and as being fair to said company, but not admitting or conceding anything appearing therein as true, or as established in the case. The substance only of that answer will be given, as follows:

The Southern Railway Company, speaking generally, asserts in its answer that the obligation of providing adequate station facilities at Selma, N. C., rests upon the Atlantic Coast Line Railroad Company, it being only a renter of the station, or the use thereof, from that company, which is solely responsible for its condition, facilities, and upkeep, under an agreement between the companies dated 29 June, 1899.

That it has the right to appeal from the order dated 11 September, 1914, of the North Carolina Corporation Commission, although a very long space of time has elapsed since it was made, and relies also upon the order of 11 April, 1922, as giving this right; and further, that it had no proper notice of the order of 11 April, 1922, and no opportunity to be heard in regard to it, and that it was not a party to the proceeding in which that order was made. That the Commission has recognized the sole responsibility of the Atlantic Coast Line Railroad Company for the station and its facilities at Selma. That the order requires the use of a part of the respondent's property without making any provision for compensation to respondent therefor. That conditions have changed since 1914, and even since January, 1917, when the order of that date was made, which may necessitate new plans and specifications. That the order violates the due process clause of the Federal Constitution that there is no evidence to support the order, and it is without foundation in law or fact.

The said answer pleads the benefit of the act of Congress of 1920, known as the "Transportation Act," or Esch-Cummings Act, and alleges that its financial condition is such that it is not required or permitted by said act to construct and maintain such an expensive station or depot as that designated in the order of the commission, which will be productive of no revenue to it, and finally as one of its main defenses that the North Carolina Corporation Commission is acting beyond its powers, and interfering with interstate commerce and in violation of the above act of Congress in attempting to enforce its order of 11 September, 1914, or any of its orders relating to the subject, and that the same is contrary to Federal laws and Federal policy with respect to interstate railroads

and commerce between the states.   We believe this summary of the very voluminous answer, and its exhibits, fairly and fully states the substance thereof.

On 11 April, 1922, the Corporation Commission made and entered upon its records the following order:

"Order, that the Atlantic Coast Line Railroad Company and the Southern Railway Company proceed with the construction of a union passenger station at Selma, N. C., in accordance with plans submitted by the Atlantic Coast Line Railroad Company, 9 January, 1917, and substantially on the site of the present passenger depot at Selma, and that the construction of same be completed within six months from this date."

To this order the Southern Railway Company entered exceptions, which are fully set forth in the record in this Court at pp. 30 to 36, both inclusive, but we have not set them out in extenso, because some of them, at least, are not sustained by the facts of the case as they appear by admission, findings, and otherwise.

The original order of the North Carolina Corporation Commission, dated 10 September, 1914, was in the following language:

ORDER.

Citizens of Selma v. Atlantic Coast Line Railroad Company and Southern Railway Company.

Pell, Commissioner:   The above entitled cause came on to be heard upon a complaint from citizens of Selma of inadequate station facilities at the junction of defendant roads at that place.   Evidence was taken and a personal inspection had by the Commission, and the fact found that inadequate facilities existed: Therefore, it is ordered that the defendant railroad companies erect at Selma, at the junction point, a station adequate for the future needs of such an important junction point; that the yards be so graded as to afford to all passengers proper facilities for taking trains, and that umbrella sheds be erected for the proper protection of the public.

It is further ordered that plans for the proposed station be submitted to this Commission by 15 October, 1914, for its approval.

10 September, 1914.

To this order no exception was taken by either of the respondents at the time it was made, nor for many years thereafter, to wit: about five of more years, nor until the said Commission, after indulging the railroads for that long space of time, ordered that they proceed at once with the work of constructing the station according to the plans and specifica-

tions adopted by them with the consent of the Commission, and then, for the first time, the Southern Railway Company set up its opposition to the enforcement of the said order, and in various but irregular ways attempted to except thereto.

The Corporation Commission refused to recognize the right of the Southern Railway Company to file exceptions, and held that it had waived its right to do so when the order was made in 1914, and that it actually consented to the order made, the Corporation Commission agreeing, in consideration of the existing financial condition of the railroads of this country and the difficulties brought about by the World War in the operation of them, to stay the enforcement of their judgment of 10 September, 1914, until the railroads were better able to comply with said judgment.

The Southern Railway Company thereupon filed a petition for *certiorari* in the Superior Court of Wake County before Judge Calvert, who transferred the hearing of the same to Judge Cranmer, presiding in the Superior Court of Wake County, and upon a full hearing by him of both sides to the proceedings, Judge Cranmer denied the petition for a *certiorari*, and directed a mandamus to be issued against the two railway companies to proceed with the construction of the station at Selma according to the order of 10 April, 1914, and according to the plans and specifications adopted for the purpose.

The Southern Railway Company excepted and appealed to this Court, the Atlantic Coast Line Railroad Company still agreeing to abide by the orders of the Commission and the court in all respects, and announced its readiness to coöperate with the Southern Railway Company in carrying out the same.

*Attorney-General Manning and Assistant Attorney-General Nash for Corporation Commission.*
*Manly, Hendren & Womble for Southern Railway Company.*
*Murray Allen for Atlantic Coast Line Railroad Company.*

WALKER, J., after stating the case: These two cases are so intimately related to each other that a decision of one of them (No. 254) will suffice as to both.

No. 254 was originally an application by the Corporation Commission to the Superior Court of Wake County for a mandamus against the appellants, the Southern Railway Company and the Atlantic Coast Line Railroad Company, to compel them to erect a union station at Selma, N. C., in accordance with an order of the Commission made 10 September, 1914.

This proceeding was originally commenced before the Corporation Commission, in the name of the citizens of Selma and patrons of the

two railroad companies at that place, including the public generally, against the Atlantic Coast Line Railroad Company and the Southern Railway Company, but when, by reason of the opposition of the Southern Railway Company, it assumed the nature of serious litigation between really adversary parties, the Attorney-General intervened, in behalf of the State, and thenceforward it was prosecuted in the name of "The State of North Carolina on relation of the North Carolina Corporation Commission v. The Southern Railway Company and the Atlantic Coast line Railroad Company," and this change in name was in accordance with approved practice and procedure in our courts as defined by local statutes and the decisions of this Court, although it does not, in any respect, change the substantial character of the proceeding.

The Atlantic Coast Line Railroad Company does not now make, and has not at any time made, resistance to the full execution of the order or judgment entered by the Corporation Commission on 10 September, 1914, but is willing and ready to proceed at once with the necessary work in constructing the station or depot at Selma, N. C., according to the order of the Commission and the plans and specifications already agreed upon by the two railroad companies.

The Southern Railway Company met the application of the Corporation Commission in this case (No. 254) for a writ of mandamus to enforce compliance with its order or judgment of 10 September, 1914, by a counter application to the court for a *certiorari* (No. 255) to the Corporation Commission, directing it to send up the record on appeal from its order of 11 April, 1922, to the Superior Court of Wake County in accordance with the provisions of the statute. As the Atlantic Coast Line Railroad Company has stood ready to obey the order of the Commission of 10 September, 1914, and is still ready to obey it, it is manifest from this statement that the application of the Corporation Commission for a mandamus is necessarily based upon the failure of the Southern Railway Company to appeal from the order of 10 September, 1914, and its attempt now to force, if it can, a recognition of its right to be heard, which it had expressly waived in 1914, and which has been altogether forfeited by it. This includes, also, an assumption by the State, now the plaintiff, that the order of 11 April, 1922, was not an order from which the railroad could appeal; or, in the alternative, that said railway company did not appeal from said order of 11 April, 1922, in the manner provided by law, and, consequently, assuming that such order was appealable, that the company would still not be entitled to a *certiorari* from the Superior Court.

Of course, from this statement it is apparent that if the Court should hold that the Southern Railway Company was entitled to appeal from the order of 11 April, 1922, or that, if so, it had conformed to the law

in its attempt to appeal, or was prevented from doing so by an illegal act of the Corporation Commission, then the Commission would not under the statute be entitled to a mandamus, but the Southern Railway Company would be entitled to its writ of *certiorari* to the Commission requiring it to send up the record upon its appeal. This part of the opinion, then, will be directed to a discussion of these points, in the following order, leaving for after discussion the point which goes directly to the authority of the Commission to make the orders at all.

The order or judgment of 10 September, 1914, was in its nature both in form and effect a final order or judgment, which the Corporation Commission could have enforced at once in the courts if neither of the respondent railroads had appealed from it. It is expressly admitted by both of them that no appeal was taken from that order. In consequence, however, of a direct application to the Corporation Commission by these railroads, but especially the Southern, for relief on account of the financial condition existing at the time of the order, the Corporation Commission held up or stayed its enforcement temporarily, awaiting better conditions.

The Commission's authority to make the order hereinbefore set out is found in C. S., 1041 and 1042. Section 1041 is as follows: *"To require change, repair, and additions to stations.* The Commission is empowered and directed to require a change of any station, or the repairing, addition to, or change of any station house by any railroad or other transportation company in order to promote the security, convenience, and accommodation of the public, and to require the raising or lowering of the track at any crossing when deemed necessary."

Section 1042 is as follows: *"To provide for union depots.* The Commission is empowered and directed to require, when practicable, and when the necessities of the case, in their judgment, require, any two or more railroads which now or hereafter may enter any city or town to have one common or union passenger depot for the security, accommodation, and convenience of the traveling public, and to unite in the joint undertaking and expense of erecting, constructing, and maintaining such union passenger depot, commensurate with the business and revenue of such railroad companies or corporations, on such terms, regulations, provisions, and conditions as the Commission shall prescribe. The railroads so ordered to construct a union depot shall have power to condemn land for such purposes, as in case of locating and constructing a line of railroad: *Provided,* that nothing in this section shall be construed to authorize the Commission to require the construction of such union depots should the railroad companies at the time of application for said order have separate depots, which, in the opinion of the Commission, are adequate and convenient and offer suitable accommodations for the traveling public." .

These sections, then, conferred the power which the Commission has heretofore exercised in this proceeding.

It is a valid exercise of legislative power, and being remedial, will be liberally construed. *Dewey v. R. R.,* 142 N. C., 392; *Griffin v. R. R.,* 150 N. C., 312.

C. S., 1708, confers authority upon any railroad company to condemn land for the purpose of getting to a union depot. The following order was made by the Commission on 10 September, 1914:

"Pell, Commissioner: The above entitled cause came on to be heard upon a complaint from citizens of Selma of inadequate station facilities at the junction of defendant roads at that place. Evidence was taken and a personal inspection had by the Commission, and the fact found that inadequate facilities existed; therefore, it is ordered that the defendant railroad companies erect at Selma, at the junction point, a station adequate for the future needs of such an important junction point; that the yards be so graded as to afford to all passengers proper facilities for taking trains, and that umbrella shed be erected for the proper protection of the public.

"It is further ordered that plans for the proposed station be submitted to this Corporation Commission by 15 October, 1914, for its approval."

We repeat that at the request of the Southern Railway Company this order was not enforced at that time, the request being based upon financial conditions as they were at the beginning of the World War.

In January, 1917, the Atlantic Coast Line Railroad Company filed with the Corporation Commission plans for the union depot required to be erected by the two railroad companies by the order of 10 September, 1914. These plans were submitted to the Southern Railway Company before being filed with the Corporation Commission, and were approved by that company. Thereafter, conditions still being bad, no further steps were taken by the Commission to enforce the order of 10 September, 1914, until the supplemental order of 11 April, 1922, requiring the order to be executed by the companies.

The order of 11 April, 1922, was the one which disposed of all the proceedings for State union passenger stations which had been pending before the Corporation Commission, *i. e.,* stations at Kinston, Selma, Newton, and Plymouth. That order recites that the Atlantic Coast Line Railroad Company and the Southern Railway Company had prepared and submitted plans under order of the Commission for a new passenger station at Selma in 1917. It further recites: "Before the contracts were let for the construction of these depots, conditions developed which had the effect of suspending capital expenditures for depot construction on practically all railroad lines in the United States. These conditions have been fully understood by the public, which has with

great patience accepted inadequate accommodations, in many cases, until conditions or normal prosperity for the carriers should return, when capital expenditures for such facilities could reasonably be required. The time has not yet come when the carriers can reasonably be expected to enter upon a general policy of large expenditures for depot construction. But in the cases we are now considering, where the inadequacy of facilities was pronounced and definitely ascertained, after full hearing and investigation five years ago, we are convinced that there should be no further suspension of orders made at that time looking to the provision of adequate passenger station facilities at Kinston, Selma, and Newton, and orders will now be made for construction of these · facilities as planned in 1917, and in doing so, we wish to make acknowledgment of appreciation of the patience and consideration which the traveling public has borne with inadequate facilities at these points, and particularly to the citizens of Kinston, whose depot accommodations have been most inadequate."

The order itself was as follows: "Ordered, that the Atlantic Coast Line Railroad Company and the Southern Railway Company proceed with the construction of a union passenger station at Selma, N. C., in accordance with plans submitted by the Atlantic Coast Line Railroad Company, 9 January, 1917, and substantially on the site of the present passenger depot at Selma, and that the construction of the same be completed within six months from this date."

The Southern Railway Company filed no exceptions at all to the order of 10 September, 1914; it gave no notice of appeal to the order of 11 April, 1922, within the statutory period required by C. S., 1097, and filed no exceptions within such time. That company claims that the time was extended by the Corporation Commission to 8 May, 1922, and that it did file exceptions on the latter date, 8 May, 1922. It further claims that the Corporation Commission, on 20 May, 1922, overruled such exceptions, and that it, in obedience to the statute and within ten days of the decision overruling its exceptions, gave notice of appeal, and further at that time complied with the statute.

This order, however, was a general one overruling exceptions in all cases then pending before the Corporation Commission. It is manifest, we think, that the only order in the record which affected any legal right of the Southern Railway was that of 10 September, 1914, which was admittedly not appealed from. The subsequent orders were simply supplemental to the original order, and required no more than that order required, but were made after the Southern Railway Company had notice of the intention of the Corporation Commission to enforce the order of 1914, and they were made with the sole purpose of enforcing that order. All the delay was occasioned by the request of the Southern

Railway Company for indulgence on account of the financial conditions as they had previously existed. In 1922, however, these objections to the enforcement of the order had been eliminated. Both freight and passenger rates had been increased and the volume of business done by the Southern Railway Company and its net income from such business had been materially and enormously increased. So, these orders were nothing but an expression of the intention on the part of the Commission, under changed conditions, to enforce the order made in 1914, by cancelling the stay.

An exception, in this view of the matter, could not under our local law and procedure, be entered by the Southern Railway Company, and if it could, it would not by its own force bring under review of the court to which the case would, in a proper case and by appropriate procedure, be transferred, or in which it would be docketed for hearing, the order of 10 September, 1914. It was, therefore, vain and idle for the Southern Railway Company to challenge by exception the validity of the order the Commission made on 11 April, 1922, in the hope that it would by some legal legerdemain retrieve its failure to except when the order or judgment of 10 September, 1914, was entered by the Commission. The truth is that these subsequent exceptions, with all due respect and deference to the Southern Railway Company, are the baldest afterthought, and suggested, perhaps, by the intervening passage by the Congress of the United States of the Transportation Act of 1920, or what is known as the Esch-Cummings Act, which will be notice hereafter. At any rate, there was no exception to the order or judgment of the Commission, dated 10 September, 1914, and it thereby, under our law and procedure, became a final judgment of the Commission, unimpeached and unassailable, as there is no allegation of fraud in obtaining it, or other ground in equity upon which it can be attacked.

The order of 11 April, 1922, did not have the effect, under local law and procedure, to reopen the judgment of 1914, but was simply a notice to the railroad companies in all the cases then before the Commission relating to the improvement of stations and depots, that the time for longer favor and indulgence had ceased by reason of the radical change in financial conditions, and the revival of trade and traffic, and that the judgments of the Commission in all designated cases must be obeyed, and the depots or stations improved. It would be strange, indeed, if what was intended solely as the discontinuance of an act of grace and favor, or "leniency," to use the word in the record, by the State, through its Commission, could be turned into something that will thwart or defeat its good purpose and intention to promote the safety, convenience, and comfort of its citizens, and the patrons of the railroads, by bettering the conditions at various railroad stations throughout the State, on its intra-

state lines, and it will require a very clear indication of such a purpose on the part of the Congress of the United States to convince us that any interference with such a just and beneficent scheme was intended by it.

The judgment of the Commission, dated 10 September, 1914, being therefore a final one, under local law and practice, and not excepted to at all, and certainly not in the proper manner, settled conclusively the rights of the parties thereto, and, it may be added, the Commission had full and ample jurisdiction to render the judgment, as it did, after notice and hearing. The respondent, consequently, has enjoyed to the full the asserted right of due process, and the cognate one of the law's equal protection, and is really seeking now to have more than its proper and equal share of both.

And finally, we hold that the alleged agreement on the part of the Commission extending the time for filing exceptions to the order of 11 April, 1922, if ever made, did not, as a matter of law under our practice and procedure have the effect to grant or extend the time for excepting to the final judgment of this court of record entered on 10 September, 1914. The notice or order, if it may be so called, of 11 April, 1922, was not any judicial determination of the Commission, nor was it of such nature that it could be excepted to and appealed from. It was a mere notification that the grace or favor extended to the railroad companies had ceased and would no longer be recognized, and it was a matter entirely within the discretion of the Commission, and for that reason, if for no other, was not appealable.

Upon inspection of the statute and decisions of this Court, it will be seen that an appeal, in order to be a valid one, must have been taken within the time prescribed by law. The records of the Commission, which is made by C. S., 1023, a court of record, show no appeal taken by the Southern Railway Company within the statutory time, and it is suggested now that there was a verbal understanding that it should have further time, but absolutely nothing to that effect is disclosed by this record. The records must show that an appeal was duly taken. *Howell v. Jones,* 109 N. C., 102, and cases there cited.

The statutory notice of appeal is mandatory, and the time within which such notice may be given cannot be extended by the parties of record. As a matter of fact, however, there was nothing in the order of 11 April, 1922, when interpreted in connection with the order of 10 September, 1914, and the proceedings before the Commission, which at all affected the rights of the Southern Railway Company, and so no appeal would lie from that order, and we so hold. *Hardware Co. v. R. R.,* 147 N. C., 483. We may take it as established, then, that there was no appeal in this case, and that the right to the mandamus under C. S., 1103, is a clear and established right. In such cases the mandamus

issues as a matter of course.  *Betts v. Raleigh,* 142 N. C., 229; *Edgerton v. Kirby,* 156 N. C., 347; see, also, *Dula v. School Trustees,* 177 N. C., 426; *Hamlin v. Carson,* 178 N. C., 431; *Corporation Com. v. R. R.,* 170 N. C., 560.

C. S., 1103, permits the mandamus asked for in this case, and is as follows: *"Peremptory mandamus to enforce order, when no appeal.* If no appeal is taken from an order or judgment of the Corporation Commission within the time prescribed by law, but the corporation affected thereby fails to put said order in operation, the Corporation Commission may apply to the judge riding the Superior Court district which embraces Wake County, or to the resident judge of said district at chambers, upon ten days notice, for a peremptory mandamus upon said corporation for the putting in force of said judgment or order; and if said judge shall find that the order of said commission was valid, and within the scope of its powers, he shall issue such peremptory mandamus. An appeal shall lie to the Supreme Court in behalf of the Corporation Commission, or the defendant corporation, from the refusal or the granting of such peremptory mandamus."

The Southern Railway Company, however, contends that the order directing the construction of this depot was one beyond the competency of the Corporation Commission, since the enactment of what is known as the Transportation Act of 1920 (41 Statutes at Large, pp. 474 *et seq.*), and as sustaining that view, the counsel for the railroad cite *R. R. Commission of Wisconsin v. R. R.,* 42 Sup. Ct. Rep., p. 232, and *R. R. v. R. R. Commission,* 221 Pac. (Calif.), p. 460.

This suggestion, with all due respect, as we submit, disregards the facts of this case.  This station at Selma is necessary for the convenience of the people who use the Southern Railway for transportation from point to point within the State.  That portion of the Southern Railway which passes through Selma is one of its branches that runs from Goldsboro, N. C., to Greensboro, N. C. (as the *terminus a quo* and the *terminus ad quim*), and consequently it is wholly an intrastate line, and a part of the North Carolina Railroad leased to it, and operated solely in this State.  It carries no passengers without the State, taken on at Selma, but only to local points.  This is necessarily true from the fact that the Selma station is located upon the direct north and south main line of the Atlantic Coast Line Railroad Company.  A passenger would, in preference to the Atlantic Coast Line, take the Southern at Selma and travel 130 miles to Greensboro before commencing his northern journey. This, also, would apply to the passenger who wished to go south.  So far as the station at Selma is concerned, then, it is for the convenience and comfort of *local* passengers.  If the Southern's part of the cost of erect-

ing this station should prove to be $25,000, it could in no sense be a direct burden upon interstate commerce, and in no sense an undue, unreasonable, and unjust discrimination against interstate commerce within the principle of the *Wisconsin Intrastate Rates Case, supra.* *Chief Justice Taft,* as is usual with him, favors us with a very clear and able discussion of this question as to interstate and intrastate commerce, and closes the opinion as follows:   "It is said that our conclusion gives the Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress.   It does not involve general regulation of intrastate commerce.   Action of the Interstate Commerce Commission in this regard would be directed to substantial disparity which operated as a real discrimination against an obstruction to interstate commerce, and must leave appropriate discretion to the State authorities to deal with intrastate rates as between themselves on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce."

It appeared as a fact in that case that the difference between the intrastate rates fixed by the State of Wisconsin and those fixed by the Interstate Commerce Commission resulted in the loss to the railroad involved of $6,000,000 per year.   In the *New York case, supra,* it would have been $12,000,000.   It was in this enormous disproportion that the Supreme Court of the United States found the discrimination against interstate commerce.

As pertinent to this part of the discussion, we refer to Ruling Case Law, vol. 5, title "Commerce," p. 702, sec. 15, which reads as follows: "In the exercise of the police power, the states or their municipalities may enact statutes and ordinances to protect the public health, the public morals, the public safety, and the public convenience; that is, they may adopt any legislation or regulation for any of those purposes and relative to interstate or foreign commerce, provided such laws or ordinances are local in their character and affect interstate commerce incidentally only, and especially is such a power favorably recognized when it is so exercised as to be an aid to such commerce.   It has even been said by the Supreme Court of the United States that the proper exercise of the police power is not only a right of a state, but that a state is under an obligation to establish such regulations as are necessary or reasonable for the welfare and safety of all domiciled within its limits.   A statute, however, purporting to have been enacted to protect the public health, the public morals, the public safety, or to serve the public convenience must have some real or substantial relation to those objects, and cannot, in any event, be allowed to operate so as directly to burden or trammel interstate or foreign commerce, or to trench upon those subjects which

are national in their character and which are within the exclusive power
of Congress to regulate. A presumption may and should be indulged
that a statute was enacted in good faith, for any of the purposes for
which this police power can be exercised, but its operation and validity
must be determined by its natural and reasonable effect. The exercise
of the state's police power must yield when it comes in conflict with an
affirmative exercise by Congress of its power to regulate commerce, but
in the application of this principle of supremacy of an act of Congress
in a case where the state law is but an exercise of this reserved power,
the repugnance or conflict should be direct and positive, so that the two
acts cannot be reconciled or consistently stand together. The reference
at this place to the police power of the states must necessarily be general,
and merely suggestive, as the discussion throughout the article hereafter
of the different subjects of regulation has relation largely to the exercise
of this power with reference thereto, and to the power of the states to
legislate with respect to their purely local concerns incidentally affecting
commerce."

Just in this connection we wish again to call attention to a portion of
the order of the Corporation Commission made on 11 April, 1922: "The
time has not yet come when the carriers can reasonably be expected to
enter upon a general policy of large expenditures for depot construction.
But in the cases we are now considering, where the inadequacy of facili-
ties was pronounced and definitely ascertained after full hearing and
investigation five years ago, we are convinced that there should be no
further suspension of orders made at that time looking to the provision
of adequate passenger stations."

It is apparent from this that the Corporation Commission had not
entered upon any large scheme compelling the erection of stations at
local points or union stations at connecting points. It was dealing with
and purposed only to deal with those necessary stations, the condition of
which had so taxed the patience and disappointed the just expectations
of travelers in North Carolina. There can be no claim, then, upon this
record that there has been any discrimination against interstate com-
merce, or any such wholesale requirement of the construction of new
stations as to impair materially the income of railroads engaged in inter-
state commerce. The particular station involved, as we have shown, so
far as it concerns the Southern Railway, is one which interstate travelers
scarcely use.

The headnote to the *California case* cited by the counsel for the
Southern Railway Company sufficiently shows the extent and scope of
that decision: "Interstate Commerce Act, sec. 5, par. 1, subds. 4, 5,
as amended by Transportation Act, 28 February, 1920, sec. 407, and
sec. 15 a, as aided by sec. 422, extending the powers and duties of the

Interstate Commerce Commission, sec. 1, subd. 3, as amended by sec. 400 and subds. 10, 15, 18-20, as amended by sec. 402, investing the Commission with powers over the changes in lines, tracks, etc., of railroads engaged largely in interstate commerce, sec. 1, subds. 21, 22, as amended by sec. 402 and sec. 3, subds. 3, 4, as amended by sec. 405, limiting the extension of authority of the Commission to railroads wholly within the state not operated as part of the general systems, gives power and authority over the matter of union terminal depot facilities of railroads, largely engaged in interstate commerce, to the Interstate Commerce Commission, and by the act the State Railroad Commission has been divested of the power over the subject."

It is manifest, we think, from this that the California Court was dealing with an entirely different situation from that presented in this case. The Transportation Act of 1920 expressly dealt with terminals and the laying of tracks to those terminals. *Chief Justice Taft*, in his opinion in the *Wisconsin Passenger Rate case*, refers to that fact as follows: "The act sought to avoid excessive incomes accruing, under the operation of section 15 a, to the carriers better circumstanced by using the excess for loans to the others and for other purposes. The act further put under the control of the Interstate Commerce Commission, first, the issuing of future railroad securities by the interstate carriers; second, the regulation of their car supply and distribution, and the joint use of terminals; and third, their construction of new lines and their abandonment of old lines. The validity of some of these provisions has been questioned. Upon that we express no opinion. We only refer to them to show the scope of the congressional purpose in the act."

We have examined the act of 1920 carefully, and we do not find any provision therein which grants to the Interstate Commerce Commission, either expressly or by clear implication, the power, or which makes it its duty, to require the erection of passenger stations. It is not claimed in this case that such an order has been made by the Interstate Commerce Commission. The right of the State, then, to act in this particular is expressly preserved to it by the Transportation Act of 1920, sec. 402, subsec. 17 (41 Stat. at Large, p. 477), as follows: *"Provided, however, that nothing in this act shall impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this act."*

It is noticeable that the Corporation Commission expressly disclaimed any intention or purpose to require the railroads in this State to enter upon a general system of station or depot improvement. It is simply requiring them to perfect and complete improvements found necessary

eight and one-half years ago. If all of these improvements are made as ordered by the Commission, there could, by no possibility, be any decreasing of the incomes of these railroads in such way as to constitute the expenditure a burden upon interstate commerce or impair the ability of the railroads to serve the public in such interstate commerce.

Further discussing the act of the Congress of 1920, therein designated as the "Transportation Act," or the "Esch-Cummins Act," we say in the beginning that that act was approved 28 February, 1920, and its terms, and the language used by the Congress, indicate clearly the purpose that it should have a prospective operation. It looks to the future and not to the past. At least, this is the general rule, says a great law-writer, that acts of the Legislature will not be so construed as to make them operate retrospectively, unless the Legislature has explicitly declared its intention that they should so operate, or unless such intention appears by necessary implications from the nature and words of the act so clearly as to leave no room for a reasonable doubt on the subject. The reason for this rule is the general tendency to regard retrospective laws as dangerous to liberty and private rights, on account of the liability to unsettle vested rights or disturb the legal effect of prior transactions. "Retrospective laws being in their nature odious, it ought never to be presumed the Legislature intended to pass them, where the words will admit of any other meaning." "Legislation of this character is exceedingly liable to abuse, and it is a sound rule of construction that a statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively." Generally, when the Legislature designs that a statute shall operate upon past or present facts or transactions as well as upon future transactions, its intention in that regard will be expressed by apt words. Black on Int. of Laws (1896), pp. 250-252. And the same is laid down in another treatise which has met with high commendation and much approval, as follows: "Purely retrospective laws involve the exercise of judicial rather than strictly legislative power. · Operating not only on future rights and liabilities, but also on matters that occurred, or rights and liabilities that existed before the time of enactment, they pronounce judgment on what was done before their enactment. Every law that takes away or impairs rights that have vested under existing laws is generally unjust, and may be oppressive. Hence, such laws have always been looked on with disfavor. It is a maxim, which is said to be as ancient as the law itself, that a new law ought to be prospective, not retrospective, in its operation (*nova constitutio futuris formam inponere debet non præteritis*). The objection to retroactive legislation has also been expressed in the maxim *Leges ·quae retrospiciunt raro, et magna cum cautione sunt adhibendæ neque enim Janus locatur in legibus,*

'laws which are retrospective are rarely and cautiously received, for Janus has really no place in the laws.' The American constitutions have invariably imposed limitations on this class of legislation. While the Constitution of the United States and the constitutions of many of the states contain no provisions directly forbidding retrospective laws, such laws are void if they impair the obligation of contracts or vested rights. Even though the Legislature may have the power to enact retrospective laws, a construction which gives to a statute a retroactive operation is not favored, and such effect will not be given unless it is distinctly expressed or clearly and necessarily implied that the statute is to have a retroactive effect. There is always a presumption that statutes are intended to operate prospectively only, and words ought not to have a retrospective operation unless they. are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied. Every reasonable doubt is resolved against the retroactive operation of a statute." 25 R. C. L., at p. 785, sec. 35 *et seq.* But authorities substantially to the same purport could be greatly multiplied. Cooley Const. Lim., 370. This rule against retrospective laws is not only of great antiquity and dignity in the English law, but is also recognized in various foreign systems. It was a part of the imperial Roman law. *"Leges et constitutiones futuris certum est dare formam negotiis,"* etc. Codex Lib. I, title 14, sec. 7. It is so provided in the Civil Code of France, art. 2; Black's Int. of.Laws, p. 251, note 11.

We do not even suggest or intimate that any right has become vested by the proceedings before the State Corporation Commission, but courts, we believe, will apply as nearly as they properly can this principle in the construction and operation of statutes, both Federal and State, because it is so just, fair, and right that it should prevail, and especially so when the proceedings have finally passed or culminated unto a solemn judgment of the tribunal having full jurisdiction as a court of record to hear evidence, as was done, and adjudge according to the law and the rights of the parties under it.

There is absolutely nothing, as we think, in the contention of the respondent that, what it calls the order of 11 April, 1922, was, or was intended to be, a revival or reinstatement of any right they had lost by waiver or surrender, for under a proper construction of the statute of this State relating to the Commission and regulating the proceedings in that court, it was nothing more, and was not intended to be anything more, than a mere notification to the respondents that the stay or execution it had granted, not as being at all compulsory upon it, but as a mere act of grace or favor to them in view, and in lenient consideration of their embarrassed financial condition growing out of the war and the

operations of their lines or systems by the Government must cease and thereafter be of no effect. The respondent has given far too technical a construction of the actings and doings of the North Carolina Corporation Commission. It has really done, nothing more than indulge or accommodate the respondent, and while the members of that honorable body are benevolently disposed sometimes to extend rather too liberally or generously favors to counsel or parties, which may prove to be detrimental to the public good, or the promotion of its interests, we are quite sure they did not intend to do so in this case, nor did they suppose, or for a moment anticipate, that either of the respondents would attempt to turn into an advantage what was intended merely as an act of grace, or leniency, in dealing with the question before it, because of the financial stress and embarrassment of the railroad companies consequent upon the late war, and seek protection and refuge in an appeal to a law passed long since the final judgment was rendered by the Commission, but which fortunately has no application, near or remote, to this case, as can be easily shown. The Esch-Cummins Act, designated in the act itself as the "Transportation Act of 1920" (U. S. Statutes at Large, vol. 41, Public Laws (Part 1) of the 66th Congress, p. 456 *et seq.,* applies to terminals and terminal facilities (sec. 400 (3), p. 474), and while the respondent, by reasoning, which with deference we say is not at all logical or clear, attempts to extend this plain and perfectly understandable provision to the Selma station and the connection at that place, it is manifest that no provision or clause of that subdivision of the act, or any other similar expression of the act, was intended to have any such application or meaning. The language simply means what it says, and nothing more and nothing otherwise, and the argument that the expenditure necessary to make the station construction and improvement required will so tax the resources of the respondent that it will be disabled to carry on its general traffic, or to perform its other duties, and will be impracticable without substantially impairing the ability of a carrier to handle its own normal business adequately. But it must be understood and emphasized just here that this reference to the "impaired ability" of the carrier in the act refers only to "terminal facilities," and is not made applicable to those along the line or route of carriage or transportation. The respondent relies on this provision in the act, as if it did apply to the kind of station and other facilities at Selma, which are not terminal in character, but take it that it does, we see that there will be no such impairment of the carrier's ability in the performance of its general or specific duties to the public. The effort of the respondent to show that it will is not only feeble, but utterly impotent and unavailing. The record shows the contrary, and the carriers' resources are constantly increasing.

We might take up the provisions of the act of 1920 in detail, but such a consideration of it would lead merely to the same conclusion, that enforcing the judgment of the Commission will not have the effect "to burden or trammel interstate or foreign commerce, or to trench upon those subjects, which are material in their character, and which are within the exclusive power of Congress to regulate," as was said *supra* in 5 R. C. L., pages 702, 703, and 704, but it would rather have the opposite effect and tend to be an aid to commerce, and so, as the books and authorities all state, should receive from the courts favorable recognition, especially when there can be harmonious operation of both systems of laws.

We have carefully read and considered the authorities relied on by the respondent, in connection with its construction of the Transportation Act of 1920 (Esch-Cummins Act), and are unable to see how they apply here, or have any helpful bearing upon the questions raised in this record. The California case (*Atchison, etc., Company v. Railroad Commission,* 211 Pacific Reporter, 460) discusses and decides questions totally different from those under consideration here, which we have fully shown above in referring to the provisions of the Transportation Act of 1920, as to terminal facilities. The same may be said of respondent's answer to the citation by Mr. Nash, Assistant Attorney-General, of *Mo. Pac. Railroad Co. v. Larabee Flour Mills Co.,* 211 U. S., 612. The citation by respondent, the Southern Railway Company, of *Railroad Commission of Wisconsin v. Chicago, etc., Railroad Company,* 257 U. S., 563, is equally unfortunate, and the quotation from the opinion of *Chief Justice Taft* does not prove anything useful to the respondent in this case. He said: "It is manifest from this very condensed recital that the act made a new departure. . . . The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain adequate railroad service for the people of the United States. This is expressly declared in section 15a to be one of the purposes of the bill." And the contention that rates are inseparably connected with and conditioned upon "efficient and economical management and reasonable expenditure for maintenance of way, structures and equipment" by interstate railroads, indicates that Congress has occupied the field of carrier expenditure for such facilities as depots, certainly at junction points between two interstate railroads, and the State power must be subordinated to the Congressional definition of carrier duty, does not, if true, advance the respondent one single step towards the goal it is seeking to reach, and is without any significance, if not entirely irrelevant to a discussion which is pertinent to the case. It all may be fully granted or conceded, and yet we find it proves nothing, if the last quotation from respondent's brief does not contain a complete

*non sequitur.* Some of its general assertions may be admitted without in the least impairing the strength or logical correctness of our conclusion or the argument that supports it.

While the Esch-Cummins bill was being debated on the floor of the House of Representatives, Congressman McClintic of Oklahoma offered the following amendment (Congressional Record, 15 November, 1919, p. 9067): *"Provided further,* that the Commission is hereby given authority to require a carrier to maintain his present arrangement or to make new arrangements relative to the joint use of depots, upon such terms as shall be found by the Commission to be just and reasonable. No carrier shall be allowed to discontinue the use of a depot in connection with another carrier until proper application has been made to the Commission." The purpose of this amendment, as explained by Congressman McClintic (pp. 9067-9068) was to give the Interstate Commerce Commission jurisdiction over union passenger depots, largely for the purpose of preventing the railroad companies from tearing apart the unification of passenger depots so extensively established by the government during the Federal operation of the railroads. Chairman Esch opposed the adoption of the amendment on the ground that jurisdiction over such matters had always been vested in the various states, and should continue to be exercised by them. Chairman Esch said (Congressional Record, 15 November, 1919, p. 9068): "Mr. Chairman, the matter which the gentleman from Oklahoma seeks to reach by his amendment lies almost wholly within the police power of the several states. There have been amendments offered to this bill seeking to preserve such police powers. The committee in framing the bill has sought not to encroach upon such powers. The matters of depots and joint use of depots is practically in the jurisdiction of the state commissions, and all but one of the states have such commissions. In such small matters the detail should be left within the jurisdiction of the state authorities, who know the situation, know the conditions, and know how best to meet the needs. There is, however, a provision in this bill providing for the joint use of terminals." Mr. McClintic thereupon offered to withdraw the amendment, but another member insisted on having a vote thereon. Thereafter his amendment, which would have conferred upon the Interstate Commerce Commission jurisdiction over union passenger depots, was rejected (Congressional Record, 15 November, 1919, p. 9071). This would seem to indicate that the Congress saw fit to leave the Federal Commission without jurisdiction, understanding that the matter of union stations would continue within the jurisdiction of the state commissions.

The propriety of referring to statements made by a committee member in charge of a bill, of course, is well recognized. See *Church of the*

*Holy Trinity v. United States,* 143 U. S., 457; *United States v. St. Paul, etc., Railway,* 247 U. S., 310; *Duplex Printing Co. v. Deering,* U. S. Supreme Court Advance Opinions, 1920-21, page 176; also the *Wisconsin Passenger Fare case.*

We would also call attention to the following language in *State of Texas v. Eastern Texas R. R. Co.* (decided 13 March, 1922): "As a whole, these acts show that what is intended is to regulate interstate and foreign commerce, and to affect intrastate commerce only as that may be incidental to the effective regulation and protection of commerce of the other class. They contain many manifestations of a continuing purpose to refrain from any regulation of intrastate commerce, save such as is involved in the rightful exertion of the power of Congress over interstate and foreign commerce."

The construction of a union station may be necessary for purposes of intrastate commerce. If Congress has refrained from any regulation of such commerce, and has left to the state, in the exercise of its police power, the right to require reasonable provision for intrastate passenger business, then the state must have the power to require the construction of such station, especially as it will not interfere with interstate commerce, but rather will tend to aid it.

The contention of the respondent railway company comes to this, that the Congress, in passing the Transportation Act of 1920 (Esch-Cummins Act), intended to give it, not only a retrospective meaning and signification, but such a retroactive effect that it would reach back and upset even solemn and well considered judgments and final determinations of courts of record, made upon ample evidence after full argument and consideration, and which adjudicated upon the rights of the parties as to all questions involved in the litigation. We have seen by his own clear and unmistakable utterances that its author, or, at least, one of its authors, repudiated such a suggestion while the law was in the making, when he indicated that it was intended, as little as possible, to interfere with the free action of the states in the enforcement of their police regulations, and only to intervene when imperatively demanded for the enforcement of the Federal law as to interstate commerce or its protection and preservation for full operation where required. We cannot think, upon a bare inspection of that much discussed and criticised law, that the Congress intended it should have such far-reaching effect and consequences, and that it should obstruct the State Corporation Commission in the exercise of its proper and legitimate functions, and especially when it was not interfering with interstate commerce, but proceeding in aid of it and for the advantage and convenience of the public. Legislation construed to have the opposite meaning would be considered, not only as unusual, but as startling. *R. R. v. Railway Commission,*

211 Pacific Reporter, No. 3, Feb., 1923, p. 460, and the Wisconsin case (*Railroad Commission v. R. R.*, 42 Supreme Court Reporter, 232), do not conflict with our view of the matter, nor do they, or other cases cited, militate against it, but are easily reconciled with it, when properly construed.  Referring to *R. R. v. Larabee Flour Mills*, 29 Supreme Court Reporter, 214, the Court, in *R. R. v. Railroad Commission, supra*, says, at p. 464 of Sup. Ct. Reporter: "That case held that the mere delegation by Congress to the Interstate Commerce Commission of power to act in a given matter did not prevent such action by the state authorities unless the Commission had taken action in the particular matter involved, quoting therefrom the following: 'Until then the authority of the state in merely incidental matters remains undisturbed.  In other words, the mere grant by Congress to the Commission of certain national powers in respect to interstate commerce does not of itself, and in the absence of action by the Commission, interfere with the authority of the state to make those regulations conducive to the welfare and convenience of its citizens.' "  And just before it had reached the quoted passage, the Court further said, referring to the Esch-Cummins Law or Transportation Act of 1920: "The transportation Act of 1920, sec. 405, amended the second paragraph of section 3 of the Interstate Commerce Act to provide: 'All carriers engaged in the transportation of passengers or property, subject to the provisions of this act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines in the distribution of traffic that is not specifically routed by the shipper.' "  The provision of the law, though, is otherwise in the case of terminals and in some other respects not applicable here.  It must be noted carefully that the railroad company, which is interstate in character, to wit, the Atlantic Coast Line Railroad Company, is not the resisting party, in this case, but it is only the local, or intrastate, company, the Southern Railway Company, whose line extends from Charlotte, N. C., to Goldsboro, N. C., and is therefore wholly within this State, whatever significance that may have in the decision of this appeal, which it is unnecessary to discuss now.

And again, if the respondent's contention is the correct one, then the jurisdiction of the Interstate Commerce Commission will be so extensive, and its work resulting therefrom, covering every one of the forty-eight states of this Union, will be so enormous and overwhelming as to render it utterly impossible for that Commission to perform it, so much so that it would be vain and idle to attempt it.

It is said in Fuller on Interstate Commerce, p. 100-101: "The act to regulate commerce extends to and covers all terminal facilities which, though entirely within a state, are used wholly or partly in the operations of interstate commerce. The Supreme Court has held that Congress has not so taken over the whole question of terminals, switching tracks, sidings, etc., of interstate railroads as to invalidate all state regulations relative to the interchange of traffic." And the author cites for this text, *Gr. Trunk Railway v. Mich. R. Commission*, 231 U. S., 457 (58 L. Ed.), 310, and quotes therefrom as follows: "One defense interposed was that such an order amounted to state interference with interstate commerce concerning which Congress had already legislated and that it was therefore void. The Court said: 'It is contended that the order is an interference with interstate commerce. The contention is premature if not without foundation. . . . We will not dwell on the contention of appellants that Congress has taken over the whole subject of terminals, team tracks, switching tracks, sidings, etc. We need make no other comment than it cannot be asserted as a matter of law that Congress has done so; and where the accommodation between intrastate and interstate commerce shall be made, we are not called upon to say on this record," citing *R. R. v. De Fuentes* (La. R. R. Com.), 236 U. S., 157.

It will be noticed in the Esch-Cummins Act that in withholding power from the local commission, the reference distinctly is to terminals and terminal facilities, and not to stations and station facilities, such as we have here, and this position does not conflict with the settled law in respect to interstate commerce, that where it applies, the Congress and not the state is entitled to prescribe the final and dominant rule. What we have said in this connection harmonizes with our view as to the meaning of the Esch-Cummins Act (Transportation Act of 1920) with respect to the contention impliedly advanced by the respondent, that the act has the effect to annul the judgment of our Corporation Commission, a court of record by virtue of our statute, whereas it is clear, we think, that such retrospective effect was not intended to be carried so far, but not that the Congress did not have the power to give it such an effect, which, for our present purpose, we may fully concede. This distinction is important. It is a question of construction if viewed in this aspect, and not of power, and we are admonished that an intention to give the act the effect of undoing transactions completed in the past "must appear explicitly, or by necessary implications, from the nature and language of the act, so as to leave no room for a reasonable doubt on the subject." If any such suggestion had been made in either of the legislative bodies, as we may judge, from what was said there, the act, as thus worded and intended, would not have received approval by the Congress.

We conclude, therefore, that the people of Selma, being the patrons of the two railway companies at that place, have shown themselves entitled to a better station building and station facilities at Selma, both upon the facts and by final judgment of a court of record competent, at the time, to try, and having full jurisdiction to try and pass upon the issues raised between the parties, and to render a binding judgment thereon.

The record states that there are four or more cases in different sections of the State which have pended for some time. But, as they are not before us, we refrain from expressing any authoritative opinion in regard to them, and we do not know judicially, or even otherwise, as we are not apprised, that the cases are sufficiently identical, in fact and law, for any expression of our views concerning them. If this decision furnishes any aid in their adjustment, well and good, but the settlement of them must be left strictly to the parties affected by them.

As to the contention that the Southern Railway Company is not the owner of the station at Selma, but only a lessee from the other company, we can only suggest that, nevertheless, it is its station, and so used by it, and being a lessee does not relieve the Southern Railway Company of its duty to maintain a station there, fit for the public to use, and sufficiently convenient and comfortable for such purpose. It cannot escape the performance of this plain duty by such a plea as the one set up, and if it will not perform it, it can be made to do so by order of our Corporation Commission, and the judgment of the Court, if any appeal be taken.

It will be observed upon even a casual reading of this opinion that we have laid the principal stress upon the provision of the Esch-Cummins Act (Transportation Act of 1920), confining, as we interpret it, the jurisdiction of the Interstate Commerce Commission to terminals and terminal facilities, or things to be done which are identical to the same. This of itself affirms the judgment, but we think it best and deferential to counsel who argued the case on other grounds so strenuously and zealously to consider their positions, in the Court's opinion, although we are satisfied those positions are not well taken.

In no view we are entitled to take of this case can we decide that there was any error in the well considered decision of Judge Cranmer, requiring the judgment of the Commission to be enforced by a peremptory writ of mandamus. Ordinarily, and usually, the writ is issued in its alternative form, but here we have heard the evidence and fully considered the defenses set up by the respondent in excuse for its failure to comply with said judgment of the Commission, and the alternative form of the writ, intended to give the respondent opportunity to be heard before compelling absolute obedience to the judgment and the writ, is

dispensed with, as the reason for issuing the writ in that form has ceased to exist.

It is therefore our conclusion that there was no error in the judgment of the lower court, as rendered by Judge Cranmer, and we must therefore affirm it, and as suggested in the "Selma Railway Connection Case" (*Corporation Commission v. R. R.*), 137 N. C., 1, this Court has the power, if it so elects, to enter judgment here, instead of remanding the case at the present time. It is therefore ordered that final judgment be entered here to the effect that a peremptory mandamus be issued from this Court compelling the respondents, Southern Railway Company and Atlantic Coast Line Railroad Company (by its consent and agreement), to comply at once with the judgment of the State Corporation Commission and any orders heretofore made by it in aid of said enforcement, and the said defendants (the two railroad companies) will prosecute the work of constructing said station, and in other respects as designated in the order of the Commission, with reasonable diligence until the same is finally completed. And for the present, at least, this cause will be retained in this Court for such further orders and directions as in the opinion of the Court may be required.

Affirmed.

WALKER, J. The application for a .writ of *certiorari* in the above entitled cause to bring up the case, by way of appeal, from the State Corporation Commission, having been fully argued and considered by us, is hereby denied.

Motion denied.

HOKE, J., concurring: I concur in the disposition made of these appeals for the reason that, in my opinion, the recent Transportation Act referred to does not, and does not intend to, withdraw from the state commissions having charge and control of the subject the power to make adequate regulation and provision for the establishment of passenger stations for intrastate travel, assuredly so except at terminal stations where the particular order or regulation is of such magnitude as to impose a substantial burden on interstate commerce, and that fact is established and made effective by appropriate proceedings instituted before the Interstate Commerce Commission.

I am authorized to say that *Associate Justice Stacy* concurs in this view.